# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| TUFFY ASSOCIATES CORP., | ) | |
| | ) | |
| Plaintiff, | ) | 01C 8027 |
| v. | ) | No. |
| | ) | |
| JOHN J. DZIUBAN, JR., | ) | JUDGE NORGLE |
| | ) | |
| Defendant. | ) | MAGISTRATE JUDGE KEYS |

*FILED-ED4*
*01 OCT 18 PH 4:06*
*CLERK U.S. DISTRICT COURT*
*DOCKETED OCT 19 2001*

## COMPLAINT

Plaintiff TUFFY ASSOCIATES CORP., ("Tuffy"), by its attorneys, for its Complaint against defendant JOHN J. DZIUBAN, JR. ("Dziuban"), alleges the following:

## JURISDICTION AND VENUE

1.     Tuffy is a citizen of Delaware, the State by which Tuffy has been incorporated, and of Ohio, where Tuffy has its principal place of business.

2.     Dziuban is a citizen of Illinois, residing in Joliet, Will County, Illinois.

3.     Thus, Tuffy and Dziuban are "citizens of different States" within the meaning of 28 U.S.C. § 1332.

4.     The matter in controversy in this action exceeds the sum or value of $75,000, exclusive of interests and costs.

5.     Accordingly, this Court has subject matter jurisdiction over this action under 28 U.S.C § 1332.

6.     Venue for this action is proper in this judicial district because Dziuban resides in this district, a substantial part of the events or omissions giving rise to the Counterclaims occurred in this district, and a substantial part of the property that is the subject of the Counterclaims is situated in

this district.

## FACTS UNDERLYING TUFFY'S CLAIMS

7.    Tuffy engages in the automotive repair business through company-owned automotive service centers, and through centers operated by franchisees pursuant to License Agreements and related contractual agreements.

8.    On or about July 1, 1999, Tuffy prepared a Uniform Franchise Offering Circular ("the Offering Circular"), a disclosure statement that meets the requirements of the Illinois Franchise Disclosure Act, and which included, among other things, all proposed agreements relating to the sale of the Joliet Tuffy Franchise. The Offering Circular was approved and registered by the Attorney General of Illinois, the Administrator of the Illinois Franchise Disclosure Act.

9.    Beginning in or about August of 1999, Tuffy and Dziuban began exploring the possibility of Dziuban acquiring ownership of a Tuffy Auto Service Center located at 108 South Larkin, Joliet, Illinois ("the Joliet Tuffy Franchise Center"). At that time, that Center was owned by a Tuffy franchisee by whom Dziuban was employed. In anticipation of entering into a franchise relationship with Dziuban, Tuffy provided a copy of the Offering Circular to Dziuban, who received it on September 3, 1999.

10.    In October of 1999, Tuffy and Dziuban executed various agreements under which Dziuban became the owner and operator of the Joliet Tuffy Franchise Center. Among those agreements were a Tuffy License Agreement, which was fully executed on October 19, 1999 ("the License Agreement"), a copy of which is attached hereto as Exhibit A and incorporated herein by reference, and a Real Estate Sublease, which also was fully executed on October 19, 1999 ("the Sublease"), a copy of which is attached hereto as Exhibit B and is incorporated herein by reference.

-2-

The License Agreement had an initial term of 15 years, with a 10 year option; the Sublease had a term of more than 11 years, with an option to extend the term for two consecutive 5 year terms. (Collectively, those agreements will be referred to herein as "the Franchise Agreements.")

11.     In connection with entering into the Franchise Agreements with Dziuban, Tuffy fully complied with all requirements imposed by law, including but not limited to, the requirements of the Illinois Franchise Disclosure Act and the Illinois Franchise Investment Act.

12.     Throughout their franchise relationship, Tuffy has fully performed all of its contractual obligations to Dziuban under the Franchise Agreements.

13.     Beginning in December 1999, Dziuban began to breach various of his contractual payment obligations to Tuffy under the Franchise Agreements.

14.     Throughout 2000, Tuffy made repeated demands that Dziuban comply with his contractual obligations. In addition, Tuffy made repeated efforts to work with Dziuban to alleviate his defaults. During that time, Dziuban repeatedly promised to make his overdue payments to Tuffy and otherwise perform his obligations under the Franchise Agreements.

15.     By April of 2001, however, Dziuban had failed to cure his defaults or cooperate with Tuffy in an appropriate matter to alleviate his breaches of his contractual obligations to Tuffy. Consequently, on April 18, 2001, Tuffy gave Dziuban formal written notice that he was in default under the terms of the Franchise Agreements. Tuffy's notice specifically listed Dziuban's defaults and demanded that he cure such defaults within ten days of his receipt of the notice or immediately call Tuffy to arrange to cure the defaults.

16.     On or about June 1, 2001, Dziuban abandoned the Joliet Tuffy Franchise Center and ceased doing business as a Tuffy franchisee, effectively terminating the Franchise Agreements.

-3-

During the period from April 18, 2001 until June 1, 2001, Dziuban failed to cure any of the defaults specified in Tuffy's April 18, 2001 notice of default, but continued to breach his contractual payment obligations to Tuffy.

17.      In addition, prior to June 1, 2001, Dziuban removed various items of equipment and other property from the Joliet Tuffy Franchise Center and converted them to his own use, on information and belief, selling such items to one or more automobile service and repair businesses which compete with Tuffy in the Joliet market.

18.      In compliance with its obligation to mitigate its damages caused by Dziuban's breaches of the Franchise Agreements, Tuffy has entered into agreements with another franchisee to operate the Joliet Tuffy Franchise Center, effective October 1, 2001.  The initial term of those agreements is one year.

## COUNT I:  BREACH OF CONTRACT

1-18.    Tuffy incorporates by reference the allegations of paragraphs 1 through 18 above as paragraphs 1 through 18 of Count I.

19.      During the term of the License Agreement until Dziuban terminated that Agreement by abandoning the Joliet Tuffy Franchise Center, Dziuban breached the License Agreements by failing to pay the following amounts that he was contractually obligated to pay to Tuffy:

| | |
|---|---|
| Royalties: | $16,403.25 |
| Advertising: | 20,714.91 |
| Finance Charges: | 12,935.65 |
| Ad Prep: | 1,657.04 |
| Other: | 29.13 |
| Total Unpaid Charges: | $51,739.98 |

The unpaid royalties amount is only up to April 1, 2001, because Dziuban failed to report his gross sales for April and May, 2001.

-4-

20.    Thus, the amount of contractual charges unpaid by Dziuban amount to *at least* $51,739.98. Those unpaid charges also are subject to late charges of 1.5% per month, pursuant to section 3.1e of the License Agreement. Such late charges continue to accrue.

21.    Pursuant to section 14.7 of the License Agreement, Tuffy also is entitled to Damages for Loss of Bargain in the amount of $40,125.26.

22.    In addition to breaching his obligations to Tuffy under the License Agreement, Dziuban also failed to pay Tuffy rent due under the Sublease for the premises where Dziuban operated the Joliet Tuffy Franchise Center. Such unpaid rent, covering the period from October 1, 2000 through September 30, 2001, amounts to $63,121.25.

23.    Both the License Agreement and the Sublease provide that Dziuban must pay all expenses incurred by Tuffy in enforcing the provisions of those Franchise Agreements, including, but not limited to, the cost of all telephone calls, correspondence, travel and legal expenses, including attorneys' fees.

WHEREFORE, Tuffy prays for entry of judgment in its favor and against Dziuban for all damages proved at trial (not less than $154,986.49), plus late charges, prejudgment interest, costs, expenses, attorneys' fees and such additional relief as the Court deems just.

## COUNT II: SUBROGATION (BREACH OF CONTRACT)

1-18.    Tuffy incorporates by reference the allegations of paragraphs 1 through 18 above as paragraphs 1 through 18 of Count II.

19.    In connection with his operation of the Joliet Tuffy Franchise Center, on or about October 22, 1999, Dziuban entered into a 60 month Non-Cancelable Equipment Lease Agreement ("the Equipment Lease") with the Bancorp Group, Inc. ("Bancorp"). A copy of the Equipment Lease

is attached hereto as Exhibit C and is incorporated herein by reference. Pursuant to the Equipment Lease, Bancorp purchased specified equipment on Dziuban's behalf and then leased the equipment to Dziuban for use in the Joliet Tuffy Franchise Center.

20.     On or about June 22, 1999, Tuffy and Bancorp entered into a Franchise Financing Agreement ("the Financing Agreement"), a copy of which is attached hereto as Exhibit D and is incorporated herein by reference. Tuffy entered into the Financing Agreement in order to provide its existing and potential franchisees a source of financing for their Tuffy franchise businesses, through equipment leases and loan agreements.

21.     Under the Financing Agreement, if a Tuffy franchisee breaches his obligations to Bancorp under an equipment lease or loan agreement, Tuffy must pay to Bancorp all amounts unpaid by the franchisee, unless a subsequent franchisee assumes the original franchisee's obligations to Bancorp. In the absence of the protection afforded by the Financing Agreement, Bancorp would not have entered into the Equipment Lease with Dziuban.

22.     Beginning in April, 2001, Dziuban breached his contractual obligations under the Equipment Lease and ceased making the $3,869.00 monthly payments to Bancorp required by that Lease. Pursuant to the Financing Agreement, because of Dziuban's default and breach of the Equipment Lease, Tuffy has been required to pay and continues to pay Bancorp $3,869.00 per month. The current operator of the Joliet Tuffy Franchise Center has not assumed Dziuban's obligations to Bancorp under the Equipment Lease, so Tuffy will have to continue to make such payments for the balance of the Equipment Lease term.

23.     As of the date of this Complaint (October 18, 2001), Tuffy has paid Bancorp a total of $27,089.02. During the entire remaining term of the Equipment Lease, Tuffy will be required to

-6-

pay an additional $111,568.65, for a total of $138,657.67.

24.     Under the Equipment Lease, Dziuban is required to reimburse Bancorp for all the expenses Bancorp incurs in enforcing its rights against Dziuban, including attorneys' fees.  As Bancorp's subrogee, Tuffy stands in the same position as Bancorp and Tuffy therefore may recover from Dziuban Tuffy's expenses, including attorneys' fees, incurred in asserting Tuffy's subrogation claim for breach of contract.

WHEREFORE, Tuffy prays for entry of judgment in its favor for all amounts paid to Bancorp because of Dziuban's defaults until the date of judgment (plus prejudgment interest) and the present value of all remaining payments under the Equipment Lease, plus costs, expenses, attorneys' fees and such additional relief as the Court deems just.

## COUNT III: SUBROGATION (CONVERSION)

1-21.   Tuffy incorporates by reference paragraphs 1 through 21 of Count II as paragraphs 1 through 21 of Count III.

22.     Prior to or in the process of abandoning the Joliet Tuffy Franchise Center, Dziuban wrongfully removed from the Center equipment and other property owned by Bancorp.

23.     On information and belief, Dziuban sold and/or otherwise transferred such property to one or more persons, thereby causing a permanent deprivation of Bancorp's absolute right to possess and control such property.

24.     Dziuban's conduct in continuing to deprive Bancorp of its right to possess and control such property amounts to the unlawful conversion of such property by Dziuban.

25.     Pursuant to the Financing Agreement, Tuffy was required to purchase on Bancorp's behalf equipment and other property to replace the property unlawfully converted by Dziuban.  The

-7-

replacement cost of such property was as follows:

| | |
|---|---:|
| A/C Charging Station (R12 and R134a) | $4,000.00 |
| Wynn's Du-all Coolant Flush Machine | 2,793.08 |
| Wynn's Transerve Trans Flush Machine | 3,456.20 |
| 40/200 Amp Schumacker Battery Charge | 185.90 |
| Booster Pack | 78.26 |
| TOTAL: | $10,513.44 |

23.     In converting Bancorp's property and converting it to his own use by selling it to third persons, Dziuban acted with malice and with utter disregard for Bancorp's right to possess and control such property, thereby justifying the assessment of punitive damages against Dziuban.

WHEREFORE, Tuffy prays for entry of judgment in its favor and against Dziuban, compensatory damages of at least $10,513.44 (plus prejudgment interest), and punitive damages in an amount sufficient to punish Dziuban for his malicious and unlawful acts and to deter him from such acts in the future, plus costs and such additional relief as the Court deems just.

Respectfully submitted,

Terence J. Moran, Esq.
GESSLER HUGHES SOCOL
    PIERS RESNICK & DYM, LTD.
70 West Madison, Suite 2200
Chicago, Illinois 60602
312/580-0100
*Attorneys for plaintiff*
*TUFFY ASSOCIATES CORP.*

## ADDENDUM TO TUFFY ASSOCIATES CORP.'S LICENSE AGREEMENT

THIS ADDENDUM is made this **19th** day of **Oct.**, 19**99**, and modifies a License Agreement of the same date ("License Agreement") executed by TUFFY ASSOCIATES CORP., a Delaware corporation ("Licensor"), and JOHN DZIUBAN, JR. ("Licensee").

A. **Initial License Fee**. The License Agreement is being issued in conjunction with the transfer of a Tuffy Auto Service Center to Licensee. As a result, Licensee is not required to pay the initial license fee set forth in Paragraph 3.1(a) of the License Agreement. In lieu of the initial license fee, Licensee must pay a transfer fee in the amount of $5000.00. The transfer fee is payable on or before the execution of the License Agreement.

B. **Initial Advertising Fee**. Licensee is not required to pay the initial advertising fee set forth in Paragraph 3.1(c) of the License Agreement.

C. **Legal Effect**. Except as modified by this Addendum, the License Agreement will remain in full force and effect and is incorporated in this Addendum by reference.

TUFFY ASSOCIATES CORP.

By: _____
   Keenan V. Moran, President


JOHN DZIUBAN, JR.

By: _____
   John Dziuban, Jr.


TUFFY ASSOCIATES CORP.
License Agreement Addendum
Joliet, IL - John Dziuban, Jr.

**PLAINTIFFS' EXHIBIT A**

## ADDENDUM TO TUFFY ASSOCIATES CORP. LICENSE AGREEMENT
## FOR USE IN THE STATE OF ILLINOIS

THIS ADDENDUM is made this 19th day of Oct , 19 99 and modifies a Franchise Agreement of even date entered into by TUFFY ASSOCIATES CORP., a Delaware corporation with its principal office at 1414 Baronial Plaza Drive, Toledo, Ohio 43615 ("Franchisor"), and JOHN DZIUBAN, JR., whose address is 3706 Theodore St., Joliet, IL 60431 ("Franchisee").

A. Termination. Subparagraphs 14.3(a) and (f) of the License Agreement are removed from Paragraph 14.3 and are added to Paragraph 14.4 as Subparagraphs (u) and (v).

B. Ohio Laws and Jurisdiction. Paragraph 17.1 of the License Agreement is amended to read as follows:

This Agreement and the construction of this Agreement will be governed by the laws of the State of Ohio, except with respect to application of the Illinois Franchise Investment Act. Any legal proceedings between the parties must be brought and conducted only in a State or Federal Court located in the County in which the Licensor's principal place of business is located and Licensee consents to those Courts having jurisdiction over its person, provided that this sentence is void with respect to any cause of action which otherwise is enforceable in the State of Illinois.

C. Representations. The second sentence of the "Acknowledgements of Licensee" section of the Introduction in the License Agreement is deleted.

Paragraph 18.7 of the License Agreement is amended to read as follows:

Licensee recognizes the uncertainties inherent in all business ventures. Licensee acknowledges that the prospects for successful operations, the level of business or profits that Licensee might reasonably expect, the desirability, profitability or expected traffic volume or profit of the Center (whether or not Licensor assisted Licensee in the selection of the location of the Center) are necessarily dependent upon variables beyond Licensor's control, including without limitation, the ability, motivation and amount and quality of effort expended by Licensee.

Licensee must, at the time of execution of the License Agreement, execute the Acknowledgment by Prospective Franchisee of Disclosure Compliance Dates and Representations, which is attached to the License Agreement.

D. Illinois Franchise Disclosure Act. The License Agreement is amended by adding the following Paragraph as Paragraph 18.11:

18.11 <u>Illinois Franchise Disclosure Act</u>. Section 41 of the Illinois Franchise Disclosure Act states that "Any condition, stipulation or provision purporting to bind any person acquiring any franchise to waive compliance with any provision of this Act is void."

TUFFY ASSOCIATES CORP.
Franchisor

By: _____
     Keenan V. Moran, President

JOHN DZIUBAN, JR.
Franchisee

By: _____
     John Dziuban, Jr.

# TUFFY ASSOCIATES CORP.
## LICENSE AGREEMENT

THIS AGREEMENT is made this 19th day of Oct _____, 19 99, by TUFFY ASSOCIATES CORP., a Delaware corporation with its principal office at 1414 Baronial Plaza Drive, Toledo, Ohio 43615 ("Licensor), and JOHN DZIUBAN, JR., whose address is 3706 Theodore St., Joliet, IL 60431 ("Licensee").

## INTRODUCTION

Franchise System. Licensor licenses a system for operation of an automotive repair business that sells, installs and services automotive exhaust systems, brakes, front end, steering and suspension, alignment, air conditioning and other automotive products and services. The distinguishing characteristics of the system include the Licensor's trademarks and logos, training, operation procedures, promotional techniques and materials, location analysis, building design and layout, record keeping and reporting. The system may be updated and revised by Licensor periodically. The system that Licensor may authorize from time to time will be referred to in this Agreement as the "System" or the "Tuffy System." The business operated in accordance with this Agreement and the Tuffy System will be referred to in this Agreement as the "Franchise Business" or "Center."

Trademarks. Licensor is the owner of numerous federally registered trademarks and service marks for the "Tuffy" name and logo and is also the owner of other trademarks, trade names, logos, copyrights and the goodwill relating to these items, which are used to identify the Tuffy System and the Center. Licensor may, in the future, develop and register additional trademarks, service marks and logos, which may be made available for use by Licensee. The trademarks and logos that Licensor may authorize from time to time will be referred to in this Agreement as the "Marks" or "Tuffy Marks."

Acknowledgements of Licensee. Licensee recognizes the advantages of operating under the Tuffy System and Marks and desires to obtain the right to operate a Center. Licensee acknowledges that it received Licensor's Franchise Offering Circular at or prior to the first personal meeting with a representative of Licensor and at least 10 business days prior to the signing of this Agreement and that Licensee has been given the opportunity to clarify provisions in this Agreement and to consult with an attorney or other professional advisor. Licensee represents that it understands and agrees to be bound by the terms and obligations of this Agreement.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

1

## ARTICLE ONE - GRANT OF LICENSE

1.1    Grant of License.  Licensor grants to Licensee the right to use the Tuffy Marks and the Tuffy System in connection with the operation of a single Center in accordance with this Agreement and the Operations Manual of Licensor (as defined in Paragraph 9.1) at the location designated on Appendix A or chosen pursuant to Article Six.

1.2    Non-Exclusivity of License; Protected Area.  This License is non-exclusive. Licensor retains the right to operate and license others to operate Centers at any other locations, except that Licensor will not operate or license others to operate Centers under the Tuffy Marks during the term of this Agreement within the geographic area described in Item 2 of Appendix A, if any ("Protected Area").  Licensor reserves the right to use the Tuffy Marks in trade shows, fairs or similar commercial exhibits within the Protected Area.  Designation of the Protected Area does not grant to Licensee exclusivity of marketing territory or clientele.  All Centers may sell their products and services to any customer.

## ARTICLE TWO - TERM AND OPTION

2.1    Initial Term.  This Agreement will continue for a term of fifteen (15) years from the date of this Agreement unless sooner terminated as provided in this Agreement.

2.2    Option.  After completion of the initial term, Licensee will have the option to remain a Licensee for an additional ten (10) year period without the payment of an additional initial license fee if:

a.    Licensee is not in default of this Agreement or any other Agreement between the parties and is not otherwise indebted to Licensor;

b.    Licensee gives written notice of its desire to continue as a Licensee not more than fourteen (14) months and not less than twelve (12) months before the expiration of the initial term of this Agreement;

c.    Licensee executes the form of License Agreement of Licensor in use at the time of renewal, which may provide for different or increased royalty, advertising or other fees, a different protected area, etc.; and

d.    Licensee complies with all standards then in effect for the approval of a new Center, including, but not limited to, decor and premises renovation as well as equipment modernization.

## ARTICLE THREE - FEES, ROYALTIES AND OTHER EXPENSES

3.1    Payments Made to Licensor.  Licensee must pay to Licensor during the term of this Agreement the following fees, royalties and charges:

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dzluban, Jr.

2

a. **Initial License Fee.** The sum of Twenty Thousand ($20,000) Dollars as the initial License fee, of which Six Thousand ($6,000) Dollars must be paid no later than the date of execution of this Agreement by Licensee and the balance of which must be paid on the earlier of (i) thirty (30) days from the date of execution of this Agreement; (ii) the first day of Licensee's initial formal training program; or (iii) the execution of a lease or sublease for the Center. No portion of the initial license fee is refundable subsequent to execution of this Agreement by Licensor.

b. **Royalty.** A royalty for the use of the Tuffy Marks and the Tuffy System of five (5%) percent of the gross sales of the Center. Gross sales means the total gross sales of all products or services sold at or from the Center or bearing the Tuffy Marks, irrespective of collection, but excluding all sales tax collected from the customer and customary bank charges for check approval, credit card processing and similar services. Gross sales include all sales, regardless of the form of payment. For example, payments by cash, check, credit, trade credit, barter, etc. are all included in gross sales. Gross sales may be further defined in the Operations Manual. The royalty must be paid on or before Wednesday of each week based on the gross sales for the preceding calendar week and must be accompanied by the reports specified in Paragraph 4.1.

c. **Initial Advertising Fee.** An initial payment of Five Thousand ($5,000) Dollars to Ten Thousand ($10,000) Dollars to be used as described in Paragraph 10.1. Licensor will specify the amount of this fee based on the size and media offerings of the market in which Licensee's Center is located.

d. **Advertising Fund Contribution.** A contribution to an advertising fund ("Advertising Fund") of five (5%) percent of gross sales (as defined above). The Advertising Fund contribution must be paid on or before Wednesday of each week based on the gross sales for the preceding calendar week and must be accompanied by the reports specified in Paragraph 4.1.

e. **Late Charge.** A late charge of one and one-half (1-1/2%) percent per month for payments not timely paid to Licensor. The collection of a late charge will not be the sole remedy of Licensor for late payments.

f. **Audit Fee and Surcharge.** If an audit of Licensee's operations reveals that not all sales subject to royalty have been reported during a reporting period, Licensee must pay to Licensor a surcharge of twenty-five (25%) percent of the amount of the royalty and Advertising Fund contribution on the unreported sales. In the event sales are misstated by two (2%) percent or more, Licensee must pay to Licensor the cost of the audit. The surcharge and audit fee must be paid by Licensee to Licensor in addition to the unpaid royalty

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

3

and Advertising Fund contribution found to be due. The imposition of an audit fee and/or surcharge will not be the sole remedy of Licensor for under reporting.

3.2    No Set-Off. Licensee's obligation to timely pay the fees to Licensor is absolute and unconditional. Licensee must not delay or withhold the payment of all or part of any fees due to Licensor for any reason or put the same in escrow or set-off against any claim or claims Licensee may allege against Licensor.

## ARTICLE FOUR - REPORTS, RECORDS, RIGHT OF ACCESS AND AUDIT

4.1    Reports. Licensee must use the standard reporting system and forms designated by Licensor. Licensee must purchase invoices, estimate forms, warranties and/or other forms from Licensor if designated by Licensor. Licensee must submit to Licensor, with and at the time each weekly payment of royalty and Advertising Fund contribution is due, a complete statement of gross sales and any other information specified by Licensor for the pre-ceding week on the forms designated by Licensor. Licensee must provide Licensor with copies of all sales or similar tax returns when filed. Licensee must provide Licensor with a quarterly profit and loss statement and balance sheet and must provide Licensor with such statements on a monthly basis if specified by Licensor. Licensee must also provide Licensor with a copy of an annual financial statement for Licensee accompanied by a review letter of a certified public accountant and a true copy of the Licensee's Federal Income Tax Return, within one hundred twenty (120) days of the close of Licensee's fiscal year. Other requirements relating to reporting may be set forth by Licensor in the Operations Manual.

4.2    Point of Sale Equipment. Licensor may require Licensee to acquire point of sale electronic equipment to capture sales, marketing and inventory control information and to link that equipment at Licensee's Center to Licensor's equipment. Licensee must, within ninety (90) days of notice from Licensor, order the equipment and related software specified by Licensor. Licensee will not, however, be required to spend more than Ten Thousand ($10,000) Dollars for this equipment and software for each Center.

4.3    Records. Licensee agrees to keep true, complete and correct books of account, business records and records of gross sales, in accordance with the methods and procedures designated by Licensor and generally accepted accounting principles.

4.4    Access and Audit. Licensor will have the right to enter upon, inspect and audit all aspects of Licensee's business including, but not limited to, all books, records, tax returns, facilities, business equipment, materials and services and any other matters relating to Licensee's obligations under this Agreement or to the use of the Tuffy Marks and the Tuffy System. Licensor need not give notice prior to such access and audit, but such access and audit must be made at reasonable times. Licensor will not unreasonably interfere with the business activities of the Licensee while conducting the audit. Licensee must cooperate fully with Licensor in providing access and in the conduct of any audit. Surcharge and audit costs may be payable on unreported royalties and Advertising Fund contributions as set forth in Paragraph 3.1(f).

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II -- John Dzluban, Jr.

4

## ARTICLE FIVE - USE AND PROTECTION OF TUFFY MARKS

5.1    Description and Acknowledgement of Marks.  The Tuffy Marks include the trade names "Tuffy," "Tuffy Mufflers, "Tuffy Service Centers" and "Tuffy Auto Service Centers" and the following Marks of Licensor which have been registered with the United States Patent Office:

| Mark | Registration Number | Registration Date |
|------|---------------------|-------------------|
| TUFFY | 922,985 | 10/26/71 |
| TUFFY and design | 1,090,273 | 05/02/78 |
| TUFFY | 1,491,523 | 06/07/88 |
| TUFFY and design | 1,498,949 | 08/02/88 |
| WE DO IT RIGHT. | | |
| WE DO IT RIGHT AWAY. | 1,579,453 | 01/23/90 |

Licensee acknowledges the validity of the Tuffy Marks and acknowledges that the Tuffy Marks are the sole property of Licensor.  Licensee agrees that any further rights that may develop in any of the Tuffy Marks in the future will inure to the benefit of Licensor.  Licensee agrees to promptly notify Licensor of any unauthorized use of the Tuffy Marks, or any name or mark confusingly similar to the Tuffy Marks, or any claim or litigation against Licensee involving the Tuffy Marks.   Licensee acknowledges that Licensor will have the right to control any negotiations, proceedings or litigation involving the Tuffy Marks.  If Licensor undertakes the expense or chooses to prosecute any violation of the Tuffy Marks, Licensee must execute all documents and do all acts necessary or incidental to that action as counsel for Licensor may reasonably request.

Licensor will indemnify Licensee against liability to third parties resulting from claims by third parties that the Licensee's use of the Tuffy Marks infringes trademark rights of the third party, but only if (a) Licensee has used the Tuffy Marks in accordance with the requirements of this Agreement and the Operations Manual and (b) Licensee has provided notice to Licensor of the claim within 10 days of receipt by Licensee of the claim and Licensee has tendered the defense of the claim to Licensor.

5.2    Use of Marks.  Licensee must use the Tuffy Marks only in connection with the operation of the Center pursuant to the Tuffy System and the sale of the products and services authorized by Licensor, and only in the manner specified in this Agreement or the Operations Manual.  Licensee's Center must be operated under the Marks and under no other name or mark.  Licensee must not use the Tuffy Marks in connection with any products or services not specifically authorized by Licensor in writing.  Licensee must not reproduce or cause to be reproduced any Tuffy Marks in any manner, including production on diagnostic forms, invoices, repair orders, warranties and in connection with advertising, without the prior written approval of Licensor.  Licensee shall not use the Tuffy Marks in its business, corporate, partnership or assumed name.  Whenever using the Tuffy Marks Licensee must identify the Tuffy Marks as being registered in accordance with the standards established by Licensor.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dziuban, Jr.

5

Licensee agrees that all sign faces and other items bearing the Tuffy Marks are the sole property of Licensor.  On expiration or termination of this Agreement, Licensee must deliver to Licensor or destroy sign faces and other items bearing the Tuffy Marks.

5.3    Modification or Substitution of Marks.  Licensor may, in its sole discretion, change the Tuffy Marks licensed to Licensee, or substitute different trademarks for the Marks, by executing, in the form of an addendum, a description of the changes or substitutions and the goods or services to which they relate (if they do not relate to all goods and services).  Licensee is required to utilize and abide by any changes or substitutions of the Marks.  Any changes or substitutions of the Marks must be made on a uniform basis for all Centers in a particular market.  Licensor will not be liable to Licensee for any expenses, losses or damages of Licensee as a result of any change or substitution of the Marks.

## ARTICLE SIX - LOCATION OF CENTER

6.1    Location of Center; Licensor's Assistance.  Licensee must operate the Center only at the location designated in Item 1 of Appendix A.  In the event that the exact location of the Center has not been determined before execution of this Agreement, Licensee and Licensor must use their best efforts to find a suitable location for the Center within the Geographic Area designated in Item 1 of Appendix A.  Licensee must only operate its Center at a location approved in writing by Licensor (the location designated in Item 1 of Appendix A or the location otherwise approved in writing by Licensor will be referred to in this Agreement as the "Licensed Location").  Licensor will provide its expertise and assistance in obtaining a location.  However, it is Licensee's responsibility to obtain the location and evaluate its commercial value for operation of Licensee's Center.  Licensor's location recommendations and its approval of a location do not constitute a representation, warranty or guarantee of the commercial value or success of the Licensed Location.

6.2    Submission of Location for Approval.  Any location chosen by Licensee will be deemed submitted for approval on receipt by Licensor of a proposed lease or purchase agreement that corresponds with the requirements of Article Seven.

6.3    Unusable or Unavailable Location.  If the Licensed Location initially approved by Licensor is or becomes unusable or unavailable for the Center (for example, because of destruction of the Licensed Location or expiration or termination of the lease for the Licensed Location), Licensee must obtain written approval for a new site.  If Licensee does not obtain written approval for a new site under those circumstances, this Agreement will terminate on conclusion of operation of the Center at the initially approved location.

## ARTICLE SEVEN - OWNERSHIP AND/OR LEASING OF CENTER; PHONE NUMBERS

7.1    Licensor's Right to Own or Lease.  Licensor will have the right, at Licensor's option, to purchase or lease the Licensed Location, or have an affiliate purchase or lease the

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

6

Licensed Location, for lease or sublease to Licensee. Any such lease or sublease to Licensee will be on Licensor's standard form of lease or sublease. This provision applies even if Licensee owns the Licensed Location.

7.2     Lease Requirements. If Licensee leases the Licensed Location from a third party, Licensor will provide its expertise and assistance in negotiating the lease. The terms and form of Licensee's lease must be approved in writing by Licensor and the lease must not be terminated, renewed or in any way altered or amended by Licensee without the prior written consent of Licensor. Licensee's lease with a third party must contain provisions specified by Licensor, including;

        a.     a provision prohibiting the leased premises from being used for any purpose other than a Tuffy Auto Service Center;

        b.     a provision recognizing and allowing the rights of Licensor described in Paragraphs 7.4, 13.3 and Article 15 of this Agreement;

        c.     a provision requiring the Landlord to give written notice and opportunity for Licensor or a person designated by Licensor, to cure any default of the Licensee under the terms of the lease before exercising any remedy of the Landlord under the terms of the lease.

7.3     Assignment of Lease. Except in accordance with this Agreement, Licensee must not assign its lease or let or sublet the Licensed Location, or any portion of the Licensed Location, without the prior written consent of Licensor.

7.4     Assumption of Lease on Termination or Expiration. If this Agreement terminates or expires for any reason, other than a termination by Licensee for cause, Licensor will have the right to assume Licensee's status and replace Licensee as lessee of the Licensed Location. If Licensor exercises this right, Licensor must assume and hold Licensee harmless from all liability under the lease arising after the assumption by Licensor.

        If the Licensed Location is owned by Licensee and this Agreement terminates or expires, for any reason, other than a termination by Licensee for cause, Licensor will have the option to lease the Licensed Location on substantially the same terms and conditions contained in Licensee's lease for the Licensed Location, or, if no such lease exists, then on terms and conditions that are commercially reasonable. The option granted in this Paragraph may be exercised by Licensor for a period of thirty (30) days following expiration or termination of this Agreement.

7.5     Phone Numbers. Licensor may, at its option, obtain and register in its name the phone number or numbers to be used at the Center. Licensee will still be responsible for all costs or charges for the installation, maintenance and use of the phone number or numbers.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

7

7.6     <u>Execution of Documents</u>.  Licensee must execute any documents specified by Licensor to accomplish any of the provisions of this Article Seven or to permit Licensor to record its rights in the real estate.

## ARTICLE EIGHT - STORE OPENING OBLIGATIONS

8.1     <u>General Responsibilities</u>.  Once a location has been approved by Licensor, it is Licensee's duty to erect or adapt a building for the Center, if necessary, make the necessary improvements to insure that the Center complies with Licensor's specifications, obtain zoning and all permits or licenses required for construction and operation of the Center, purchase the signs, fixtures, equipment, inventory and supplies specified by Licensor, hire employees and do all other acts necessary to commence operation of the Center.

8.2     <u>Construction or Improvement of the Center</u>.  To the extent necessary, the Center must be constructed and/or improved by Licensee in compliance with Licensor's standards for decor, signage and space, which standards may be changed or updated.  If an existing structure is being adapted or remodeled, Licensor must approve all remodeling plans, specifications, interior and exterior layouts and site plans before the beginning of construction work on the Center.  Licensor will assist in the process of construction or improvement of Licensee's Center, if requested, by providing standard blueprints for a modest fee, being available to interpret approved plans, periodically visiting the construction site and generally providing its expertise in constructing or improving Centers.

8.3     <u>Signs, Equipment, Fixtures and Initial Inventory</u>.  Licensee must purchase and install all signs, equipment, fixtures and initial inventory specified by Licensor before opening the Center.

8.4     <u>Hiring Employees; Shop Set-Up</u>.  Licensee must hire and train employees for the Center.  Licensor will assist Licensee in recruiting, interviewing, hiring and training Licensee's initial employees.  Also, Licensor will provide one or more of its employees to assist in the set up of Licensee's Center for one week prior to opening of the Center.

8.5     <u>Opening Date</u>.  Licensee must commence operation of the Center at the Licensed Location no later than the date specified in Item 3 of Appendix A.

## ARTICLE NINE - OPERATIONS

· ' icensee must, at all times, give
pre                                                            ...οι perform work competently and
in a wo.                                              gu wiιn the public, Licensee must be governed
by the highest standards of honesty, integrity, fair dealing and ethical conduct.

Licensee must, at all times, comply with all lawful and reasonable policies, standards and procedures specified from time to time by Licensor in connection with the operation of

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

Licensee's business, including, but not limited to, standards, techniques and procedures for: installing or servicing the products offered by Licensee or the rendering of services offered by Licensee; selection, supervision or training of all personnel; sales, advertising and promotional techniques, programs and procedures; construction, maintenance and appearance of the Center and the Licensed Location; policies and procedures relating to warranties or guarantees; payment, credit, accounting and financial reporting policies and procedures; purchase and maintenance of signs, equipment, fixtures and inventory; hours and manner of operations; trademark and signage usage; insurance coverage; and other details of the relationship between Licensor and Licensee. These policies, regulations and procedures will be contained in the operations manuals of Licensor or in memos, bulletins, newsletters or other written materials prepared by Licensor (for purposes of this Agreement, all such written policies, regulations and procedures will be referred to as the "Operations Manual"). Licensee will be issued a copy of the currently existing Operations Manual after execution of this Agreement. Licensee will be issued applicable modifications or additions to the Operations Manual as they become available. The Operations Manual, and all other manuals delivered to Licensee by Licensor, remain the property of Licensor, must not be duplicated, and must be returned to Licensor on termination of this Agreement.

Due to the nature of operations of a Center and the fact that the standards of operations must and do change, Licensor reserves the right to change the terms of the Operations Manual from time to time. The terms of the Operations Manual cannot change the terms of the License Agreement but will be in addition to those terms and will have the same effect as if set forth in this Agreement. If the Operations Manual is inconsistent with the License Agreement, the License Agreement will control. Licensor agrees that it will promulgate its policies, regulations and procedures in a reasonable and uniform manner.

9.2    <u>Continuing Operation; Best Efforts</u>.  Licensee must continually operate the Center in accordance with the provisions of this Agreement throughout the term of this Agreement. Licensee must use its best efforts to promote and maximize the sales of the Center throughout the term of this Agreement. Licensee must maintain at all times sufficient inventory, equipment, supplies and personnel to operate the Center at optimal capacity and efficiency as specified by Licensor.

9.3    <u>Operational Assistance</u>.  Licensor will provide one or more employees to assist in the set-up and operation of Licensee's Center for one week after the opening of the Center. Licensor's District Manager will regularly visit Licensee's Center during the first two months after opening and will periodically visit Licensee's Center after that throughout the term of this Agreement. During these visits, the District Manager will evaluate Licensee's operations and provide any operational advice and assistance deemed necessary by the District Manager. Licensor will provide guidance on the pricing of Licensee's products and services, if requested by Licensee. Licensee is not, however, required to follow Licensor's pricing guidelines. Licensor will also provide reasonable operational advice and assistance to Licensee by telephone, including advice on specific services or products, if requested by Licensee.

9.4    <u>Products and Services</u>.  Licensee must sell all products and provide all services that Licensor from time to time specifies for sale for the Center. Licensee must not sell any

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dzluban, Jr.

9

products, provide any services or engage in any business at the Licensed Location other than those specified by Licensor without specific written authorization from Licensor.

Licensee acknowledges that its use of products not approved by Licensor or purchased from sources not approved by Licensor causes harm to Licensor's goodwill and the Marks and System of Licensor. Licensee and Licensor agree, however, that such damage cannot be specifically calculated. As a result, Licensee agrees to pay to Licensor, as reasonable liquidated damages, Two Hundred ($200) Dollars per day for each day that Licensee uses products not approved by Licensor or purchased from sources not approved by Licensor. Failure to pay such damages upon demand by Licensor will constitute a material breach of this Agreement.

Licensee shall use only the standard contracts, reports, marketing materials, stationary and printed material uniformly used by all licensees as specified by Licensor.

Licensor may expand or restrict the required or authorized products or services to be provided at the Center. Licensor must make all such changes for good faith marketing reasons on a uniform basis for similarly situated licensees.

9.5  Maintenance. Licensee must maintain the building, equipment and parking area for the Center in an attractive and safe condition, and in good maintenance and repair and in compliance with the standards specified by Licensor.

9.6  Source of Supply. Licensee must purchase all equipment, parts, inventory and supplies for the Center in accordance with specifications issued by Licensor and only from suppliers approved by Licensor. An authorized vendor will be any vendor who has met Licensor's standards relating to the composition of products, quality, packaging, performance, safety, uniformity, use of Tuffy Marks, reporting of shipments and other relevant standards established by Licensor and has been designated by Licensor in writing as an authorized vendor.

Licensee may request to have one or more vendors authorized by submitting to Licensor the information, samples or agreements necessary for Licensor's determination pursuant to the procedures specified by Licensor.

9.7  Managerial Responsibility. The individual or at least one (1) of the individuals named in Item 4 of Appendix A ("Principals") must:

a.  devote his/her/their full time and effort to the active management and operation of Licensee's Center;

b.  preserve and exercise ultimate authority and responsibility with respect to the management and operation of Licensee's Center; and

c.  represent and act on behalf of Licensee in all dealings with Licensor.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dzluban, Jr.

10

In the event of the resignation, death or incapacity of all of the individuals named in Item 4 of Appendix A, the transfer provisions contained in Article Thirteen will apply.

In the event Licensee desires to have a Manager, other than a Principal, devote full time and effort to the management and operation of Licensee's Center, the Manager must successfully complete Licensor's training program and must be approved, in writing, by Licensor. Any change in such management personnel must be approved, in writing, by Licensor.

9.8    Insurance.    Licensee must obtain and provide Licensor with evidence of insurance in the amounts and with the coverages specified by Licensor. Evidence of this insurance must be initially provided at least ten (10) days prior to the opening of the Center. Certificates of renewal must be provided no later than ten (10) days before the expiration date of each policy. If Licensee does not provide Licensor with evidence of any insurance policies at any due date, Licensor may purchase the insurance at the Licensee's expense. Licensee must immediately pay for the insurance by paying the insurance broker selected by Licensor directly, or by paying Licensor if Licensor has paid for the insurance.

Each insurance policy must name Licensor as an additional insured and must provide that Licensor will be given sixty (60) days notice before cancellation, modification or amendment of the policy.

9.9    Compliance with Laws.    Licensee must obtain and keep in force every registration, charter, license or permit required for construction and operation of the Center. Licensee must comply with all federal, state, county, municipal or other statutes, laws, ordinances, regulations, rules or orders applicable to Licensee's Center or business.

9.10    Warranties.    Licensee agrees, at its cost, to warrant the mufflers, brakes, suspension products and other related products to retail customers as set forth in documents containing those warranties provided with such products and as set forth in the Operations Manual.

Licensee must honor all warranty claims on each of Licensor's products whether installed at Licensee's Center or any other authorized franchise of Licensor or a Licensor owned Center. Specific procedures for honoring warranties may be set forth in the Operations Manual.

9.11    Interference with Employment Relations of Others.    During the term of this Agreement, Licensee must not employ or seek to employ any person who is at the time employed by Licensor, any of its subsidiaries or parent companies, or by any person who is at the time operating a Center, or otherwise induce, directly or indirectly, that person to leave that employment.

9.12    Automotive Repair Industry Accreditation Programs.    Licensee must obtain and maintain accreditation by automotive repair industry associations if specified by Licensor (such

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dzluban, Jr.

11

as the Automotive Maintenance and Repair Association's MAP Accreditation Program). Licensee acknowledges that participation in such programs may require the payment of annual dues and participation in third party dispute resolution processes for disputes with customers.

## ARTICLE TEN - ADVERTISING

10.1    Initial Advertising Fee.  Licensor may, in its discretion, use all or a portion of the initial advertising fee referred to in Paragraph 3.1(c) for advertising and promoting the grand opening of Licensee's Center or, if applicable, reimbursing the Licensor for the cost of advertising Licensee's Center in the yellow pages before the opening of the Center.  Any remaining portion of the initial advertising fee will be contributed to the Advertising Fund or may be placed in an advertising cooperative fund if a cooperative exists for Licensee's market area.

10.2    Advertising Fund.  Licensee must make contributions, as required by Paragraph 3.1(d), to an Advertising Fund that will be administered by Licensor or an agency designated by Licensor.  The Advertising Fund is intended to be used to maximize general public recognition and patronage of Licensor's Marks.  Licensor will expend all monies received for the Advertising Fund to formulate, develop and produce advertising and promotional programs and to conduct advertising and promotional programs on a national, regional or local level as Licensor determines in its discretion to be most effective in achieving the goals of the Advertising Fund.  Licensor reserves the right to engage the services of an advertising source or sources to formulate, develop, produce and conduct advertising and promotional programs. The cost of these services will be paid by the Advertising Fund.  If Licensor provides services as an advertising agency in media placement and purchasing of advertising for the Advertising Fund, Licensor will be entitled to a reasonable commission for those services.  Licensor will submit to Licensee, upon request, an annual report of the use of the Advertising Fund contributions made by Licensee.  In no event will Licensor or any agency engaged by Licensor be liable for consequential or incidental damages resulting from administration of the advertising fund or resulting from any advertising produced or placed by or on behalf of Licensor or Licensee, including any claims for loss of business.

10.3    Yellow Pages Advertising.   In addition to Licensee's Advertising Fund contribution, Licensee must participate in yellow pages advertising programs specified by Licensor.  Licensor may place appropriate yellow pages advertising for Licensee in Licensee's market.  The costs of yellow pages advertising will be billed directly to Licensee by the telephone company, yellow pages publisher, the Licensor or an agency designated by the Licensor.  Yellow pages advertising must be reasonably placed as determined by competition in Licensee's market.  Licensor may set up or retain a National Yellow Pages Service Agency ("NYPSA") to coordinate and place all yellow pages advertising for all licensees of Licensor. In the event Licensor establishes or retains an NYPSA, Licensee must, if Licensor specifies, participate in and pay its proportionate cost of advertising placed by the NYPSA (based on the policy of the NYPSA or the policy established by Licensor).  The Licensor or an affiliate of Licensor may earn a reasonable commission for the placement of yellow pages advertising. For any period after Licensee's Center opens for business, but before Licensee is listed in the appropriate yellow pages directory or directories, Licensee must pay to Licensor, on a monthly

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

12

basis for local advertising, a sum equal to the amount that Licensee would be required to pay for the required listings in the yellow pages directories. In the event Licensor or an NYPSA specified by Licensor places or undertakes to place yellow pages advertising for Licensee, the liability of Licensor or the NYPSA as a result of any errors or omissions in that advertising or the placement of that advertising is limited to the cost to Licensee of that advertising. Also, in no event will Licensor or the NYPSA be liable for consequential or incidental damages resulting from that advertising or the placement or failure to place that advertising, including any claims for loss of business.

10.4   Additional Advertising; Approval. Licensee is encouraged to spend amounts for local advertising and promotions in addition to the required contribution to the Advertising Fund. However, advertising or promotion must be submitted to Licensor for approval and must be approved in writing prior to its placement by Licensee. Licensee must not advertise any products or services for the Licensed Location, or using the Tuffy Marks, other than those products or services authorized by Licensor. Licensee agrees to honor any coupons or similar promotional materials issued by Licensor, and agrees to participate in such drives, prizes, giveaways, contests and other programs, local, regional or national, related to sales promotions, specified by Licensor to the extent that participation does not violate federal or state law.

10.5   Advertising Cooperative. Licensor may, from time to time, designate an advertising area that encompasses a group of Tuffy Auto Service Centers. If Licensee's Center is within a designated advertising area, Licensee is required to join, maintain a membership in and abide by the governing instrument of the advertising cooperative for that area. The structure of the cooperative as well as the original governing instrument of the cooperative and any changes to that instrument must be approved by Licensor. The cooperative cannot modify the terms of this License Agreement but may require Licensee to make contributions to the cooperative that are in addition to the Advertising Fund contributions paid to Licensor under Paragraph 3.1(d).

The cooperative will make decisions based on a majority of the votes entitled to be cast by its members. Each cooperative must work with the Licensor or an agency designated by Licensor in coordinating and placing regional and local advertising for the members of the cooperative. Licensor may, but is not required to, allow a cooperative to participate in decisions regarding the use of Advertising Fund contributions paid to Licensor by members of the cooperative. Each cooperative is responsible for the costs and expenses incurred by that cooperative.

## ARTICLE ELEVEN - TRAINING

11.1   Initial Training. Licensor will make available in Ohio an initial course of instruction relating to techniques for operation of the Center and utilization of the Tuffy System. Licensee must not open its Center for business without first having had a Principal of Licensee attend and complete to Licensor's satisfaction the initial training program. The training program will be conducted without charge to Licensee, but Licensee will be responsible for paying its employees's salaries, expenses for travel, food and lodging.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dziuban, Jr.

13

11.2    Additional Training, Sales Programs and Meetings.  A Principal of Licensee must, at Licensee's expense, attend any additional training, sales programs and meetings at locations and at times reasonably specified by Licensor.

ARTICLE TWELVE - CONFIDENTIALITY AND NON-COMPETITION

12.1    Confidential Information.  Licensee acknowledges that Licensor is the owner of all proprietary rights in and to the Tuffy System and all material now or later revealed to Licensee under this Agreement relative to the Tuffy System.  Licensee further acknowledges that the Tuffy System, in its entirety, constitutes confidential information and/or trade secrets of Licensor that are revealed to Licensee in confidence, solely for the purpose of enabling Licensee to establish and operate Licensee's Center in accordance with the terms of this Agreement.  This confidential information and/or trade secrets may include training manuals, policy manuals, operations manuals, sales promotion aids, business forms, installation and service procedures, accounting procedures, marketing reports, suppliers discounts and inventory systems.

12.2    Restrictions on Disclosure and Use.  During the term of this Agreement, Licensee and its shareholders, officers, partners or investors must not reveal any trade secret or confidential information to any person or entity other than Licensee's employees who require that information for the operation of Licensee's Center.  Before revealing any trade secret or confidential information to any employee, Licensee must require the employee to execute an agreement in the form specified by Licensor binding the employee to a covenant of confiden- tiality.  During and after the term of this Agreement, Licensee:

         a.    must not reveal or use any trade secret or confidential information in connection with any business or venture in which it or its shareholders, officers, partners or investors has a direct or indirect interest in any capacity whatsoever;

         b.    acknowledges and agrees that if Licensee or its shareholders, officers, directors, partners or investors engages in the same or similar business to that licensed by this Agreement, such person will have the burden of proving that he or she has not used Licensor's trade secrets or confidential information in that business; and

         c.    stipulates and agrees that twenty-five (25%) percent of gross sales during the first two (2) years of operation of a business or venture in violation of this Paragraph, or if no such business or venture exists Ten Thousand ($10,000) Dollars per violation, must be paid to Licensor for the use of the trade secrets or confidential information.

12.3    Restrictions on Competition.  Licensee, its shareholders, officers, directors, partners or investors must not refer customers that could be serviced by Licensee's Center to

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

14

any other business or person (whether or not Licensee has a direct or indirect interest in that business or person) other than another Center. Licensee, its shareholders, officers, directors, partners or investors must not directly or indirectly engage in the same or similar business as that licensed by this Agreement during the term of this Agreement, and must not engage directly or indirectly in the same or similar business within a radius of ten (10) miles from its former Licensed Location or the location of any Center existing at the date of expiration, termination (including termination upon a transfer) or non-renewal of this Agreement, for a period of two (2) years following the date of expiration, termination or non-renewal, or the date Licensee ceases to operate the competing business, whichever is later.

In the event the above restrictions or any part of these restrictions are invalid, this Paragraph will be considered as imposing the maximum restrictions allowed under the applicable state law in place of the invalid restriction or part of the restriction.

## ARTICLE THIRTEEN - TRANSFERABILITY OF AGREEMENT

13.1    _General Rule_.  This Agreement is personal to Licensee or to the Principals of Licensee (if Licensee is a corporation, partnership or other entity).  This License Agreement or any interest in the corporation, partnership or other entity (if Licensee is a corporation, partnership or other entity) must not be transferred, assigned, pledged, encumbered or sold, either directly, indirectly or contingently, whether voluntarily or by operation of law, except with the prior written consent of Licensor and then only in accordance with the provisions of this Article.  In no event will Licensee have the right to sub-license any of the rights granted by this Agreement.  Any attempted assignment or transfer not in accordance with this Agreement will have no effect and will constitute a breach of this Agreement.  Licensee must not transfer or sell substantially all of the assets of its Center, either directly or indirectly or contingently, except with the prior written consent of Licensor.  Licensee acknowledges that Licensor may reasonably withhold its consent to a sale of substantially all of the assets of Licensee's Center during the term of this Agreement unless those assets are being sold to a person who will operate a Center at the Licensed Location.

13.2    _Transfer on Death or Incapacity_.  If Licensee, or the last surviving Principal of Licensee, if Licensee is a corporation, partnership or other entity, dies or becomes permanently disabled, the Licensee's or the Principal's rights under this Agreement will pass to the estate, heirs, devisees or legal representatives of Licensee or the Principal of Licensee (collectively referred to in this Agreement as the "Estate").  The Estate may continue operation of the Center if:  (a) the Estate provides a qualified individual acceptable to Licensor to manage and operate Licensee's Center on a full time basis; (b) this manager attends and successfully completes Licensor's next offered new dealer training program; and (c) this manager assumes full time operation of the Center within one month of the date Licensee dies or becomes disabled.  If the Estate fails to designate an acceptable manager or the designated manager fails to attend and satisfactorily complete the new dealer training program and to assume the full time operation of the Center within one month of the death or incapacity, then the Estate must sell the Estate's interest in the Center or in this Agreement within two months of the date of death or disability.  Any sale must be made in accordance with the provisions of Paragraph 13.4.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

15

After the date of death or disability, until a trained manager assumes full time operational control of the Center or until the Estate's interest in the Center or in this Agreement is sold, Licensor may, at its option, assume control of and operate Licensee's Center. During any period that Licensor operates Licensee's Center, Licensor may deduct its expenses for travel, lodging, meals and all other expenses and fees from the Center's gross receipts and may pay itself a management fee of up to 5% of the Center's weekly gross receipts. This management fee will be in addition to the royalty and advertising fund contributions due to Licensor. Any remaining gross receipts of the Center, after paying all other operating expenses of the Center will be paid to the Estate. Any deficiency in amounts due to Licensor under this Paragraph or any deficiencies from operation of the Center must be paid by the Estate within 10 days of a notice of deficiency from Licensor. Licensor is not obligated to operate the Center. If Licensor does operate the Center, Licensor will not be responsible for any operational losses of the Center, nor will Licensor be obligated to continue operation of the Center.

13.3   <u>Right of First Refusal</u>.  Licensee or any person owning an interest in Licensee or any legal estate, heir, devisee or legal representative of any deceased Licensee or person owning an interest in Licensee must not transfer any interest in the Center or the assets of the Center without first offering that interest to Licensor. The terms of the offer to Licensor must be the same terms as the proposed transfer. In the event Licensee, or such other person, has obtained a bona fide, executed written offer to purchase that interest, Licensee must deliver a copy of the bona fide offer to Licensor. Licensee must also deliver copies of all documents to be executed by Licensee or such other person in conjunction with the transfer and any financial or other information as Licensor may specify to reasonably inform Licensor of the financial condition of the Center. Licensor will then have, for a period of sixty (60) days from the date of delivery of the information specified above, the right, exercisable by written notice to Licensee, to purchase that interest on the terms specified in the offer. Licensor may designate a substitute purchaser if Licensor assumes responsibility for the performance of any purchaser designated. If Licensor does not exercise its right of first refusal, Licensee may transfer the interest, subject to Licensor's rights of approval as specified in this Article, but only on the same terms as offered to Licensor. If the transfer is not completed by Licensee within sixty (60) days, Licensor will again have the right of first refusal to purchase the interest.

13.4   <u>Conditions of Licensor's Consent to Transfer</u>.  If Licensee desires to transfer any rights in this Agreement, or in Licensee or the assets of the Center, Licensee, or another appropriate person, must give written notice of the proposed transfer to Licensor, setting forth in detail the nature of the items to be transferred, the name, address and background of the proposed transferee, the consideration for the transfer and any other information that Licensor may reasonably require. This notice must also include a copy of any agreement relating to the proposed transfer. After reviewing the information, Licensor will determine, in accordance with the provisions of this Agreement and any procedures and guidelines contained in the Operations Manual, whether to grant its consent to the transfer. Licensor will not unreasonably withhold its consent to a transfer of the type permitted by this Agreement.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dziuban, Jr.

16

Before Licensor consents to a transfer, the following conditions must be fulfilled:

a.     The proposed transferee must follow the same application procedures as a new licensee and must meet the same standards of character, business experience, credit standing, health, etc. as Licensor has set for any new licensee.

b.     The terms of the proposed transfer must not place unreasonable burdens on the proposed transferee.

c.     Licensee must pay all amounts owed to Licensor and must execute at the time of sale an agreement terminating this Agreement and releasing Licensor from any claims.

d.     The proposed transferee must execute with Licensor the form of standard License Agreement in use at the time of the transfer which may provide for different royalty or advertising payments, a different Protected Area, etc. The License Agreement executed by the transferee will continue for the full term stated in that License Agreement.

e.     The proposed transferee must pay Licensor a transfer fee of Seven Thousand Five Hundred ($7,500) Dollars which will be due on the execution of a consent by Licensor to the proposed transfer. The Operations Manual may set forth instances where a transfer fee may not be required or may be reduced (e.g. transfer to family members already active in the business).

f.     The proposed transferee must agree that within ninety (90) days of the transfer it will take the action specified in Licensor's consent to make the Center comply with current appearance requirements, including signage, decor, cleanliness and layout.

g.     Licensee and the proposed transferee must comply with any other standard transfer procedures specified in the Operations Manual.

13.5    <u>Transfer of Licensor's Interest</u>.   Licensor may transfer all or any part of this License Agreement without the consent of Licensee but Licensor or its successor will remain liable for all obligations accrued to the date of the assignment.

## ARTICLE FOURTEEN - TERMINATION AND EXPIRATION

14.1    <u>Termination by Licensee</u>.  Licensee has the right to terminate this Agreement prior to its expiration only for good cause and only in accordance with the requirements set forth in Paragraph 14.5 below.  Good cause for termination by Licensee means any material breach of this Agreement by Licensor.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dzluban, Jr.

17

14.2    Termination for Good Cause.  The Franchisor has the right to terminate this Agreement prior to expiration only for good cause and only in accordance with the requirements of Paragraphs 14.3 or 14.5 below.  Good cause for termination by Licensor means any material breach of this Agreement by Licensee or the occurrence of any of the events listed in Paragraphs 14.3 and 14.4 below.

14.3    Immediate Termination.  Any of the following events constitutes good cause for termination of this Agreement and entitles Licensor to terminate this Agreement upon five (5) days written notice to Licensee without affording Licensee any opportunity to cure:

a.      Any willful and material misrepresentation by Licensee relating to the acquisition of the license granted or the ongoing operation of the Center.

b.      Any willful and repeated issuance of guarantees or warranties other than those permitted and authorized by Licensor or the willful and repeated failure to honor warranty obligations.

c.      Any transfer of this Agreement not in compliance with this Agreement.

d.      The conviction of, or plea of guilty or no contest to any crime by the Licensee or one of the Principals for which the minimum penalty includes imprisonment for more than one year, or any other crime, offense or misconduct involving moral turpitude or in any way relevant to the operation of the Center.

e.      Any abandonment by Licensee of the Center.  Abandonment will be conclusively presumed if Licensee fails to open the Center for business for a period of six (6) consecutive business days without the prior written consent of Licensor, but will not include any failure caused by a situation described in Paragraph 14.4(m) below.

f.      Any conduct by the Licensee that reflects materially and adversely on the operation or reputation of Licensor's Marks or System.

14.4    Termination after Notice Period.  Any of the following events constitutes good cause for termination of this Agreement and entitles Licensor to terminate this Agreement in accordance with the requirements set forth in Paragraph 14.5 below:

a.      failure of Licensee to promptly pay its obligations to third party suppliers as they become due, failure to pay rent or the occurrence of any other default under a lease or finance agreement for the real or personal property comprising or located at the Licensed Location, or upon the commission of any act which would, under the applicable provisions under the Bankruptcy Reform Act, as amended, permit the filing of a petition by or against the debtor;

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

18

b.     a breach by Licensee or any corporation, partnership, limited liability company or other entity controlled by Licensee or the owners of Licensee, of any of the terms of any other agreements entered into with Licensor, including, if applicable, but not limited to, any lease for the Licensed Location, lease or purchase agreement for equipment at the Licensed Location, the term of any financing arrangement with Licensor, or any other license agreements or subleases;

c.     adjudication of bankruptcy of Licensee or the insolvency of the Center or the appointment of a receiver or trustee to take charge of Licensee's business by a court of competent jurisdiction;

d.     failure of Licensee or one of the Principals to successfully complete Licensor's training program;

e.     general assignment by Licensee for the benefit of creditors;

f.     a final judgment or the unappealed decision of a regulatory officer or agency which results in a temporary or permanent suspension of any permit or license, possession of which is a prerequisite to operation of Licensee's Center;

g.     failure of Licensee to make payments to Licensor or supply reports to Licensor as required by this Agreement or any other agreement entered into between the parties hereto, within five (5) days after such payment or reports are due;

h.     any material inaccuracy or numerous inaccuracies in the accounting of Licensee's gross sales or financial statements;

i.     failure of Licensee to use Licensor approved equipment, materials and products or use of substitute equipment, materials or products not approved by Licensor at the Center or with the Tuffy Marks;

j.     failure of Licensee to properly display the Marks, or using the Marks in any unauthorized manner;

k.     failure of Licensee to commence operation of the Center within the time specified in Paragraph 8.5 above;

l.     the loss by Licensee of a right to occupy the Licensed Location;

m.     destruction of the Center and the failure to reconstruct the Center or to establish reasonable plans for reconstruction within one hundred twenty (120) days of the destruction;

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dziuban, Jr.

19

n.    failure or refusal of Licensee to make business records and books available to Licensor or its authorized representative for audit purposes;

o.    failure of Licensee to meet current quality control standards according to the provisions of the Operations Manual or failure to permit quality control checks and inspections of the Licensed Location by Licensor's representatives;

p.    repeated failure of Licensee to operate in accordance with the uniform standards of Licensor;

q.    failure of Licensee to respect and hold in confidence the confidential information and/or trade secrets disclosed to or learned by Licensee;

r.    failure of Licensee to honor customer warranties;

s.    the cancellation of any guaranty of the obligations of this Agreement that was executed in conjunction with the execution of this Agreement; and

t.    any other breach of this Agreement or the policies set forth in the Operations Manual.

14.5    Notice Required for Termination; Cure; Notice of Defenses and Claims.  The following procedures must be used for termination for good cause (other than termination under Paragraph 14.3 above):

a.    The party terminating for good cause ("Terminating Party") must give a written notice of termination to the party in default ("Defaulting Party") specifying any reason or reasons for the termination and the date the termination will be effective.  The effective date of termination must be at least ten (10) days for the non-payment of any amounts due, and at least thirty (30) days in all other instances, from the date the notice of termination is postmarked or from the date of personal service, whichever is applicable.  Except as provided in Sub-Paragraph (b) below, termination will be automatically effective without further action by the Terminating Party upon the date specified in the notice as the effective date of termination.

b.    The Defaulting Party may prevent termination only by completely curing, prior to the date specified in the notice as the effective date of termination, all the defaults specified by the Terminating Party in the notice. This right to cure will not apply if (i) the defaulting party, after previously curing any default, engages in the same default within a period of twelve (12) months whether or not such default is cured after notice, or (ii) the defaulting party has

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dzluban, Jr.

20

repeatedly failed to comply with one (1) or more requirements of the License Agreement, whether or not corrected after notice.

      c.     The Defaulting Party must give written notice to the Terminating Party of all objections, defenses or disputes to termination, claims against the Terminating Party, set-offs, breaches of the License Agreement by the Terminating Party or other actions, claims or defenses that the Defaulting Party may have against the Terminating Party. This notice must be given within thirty (30) days from the date the notice of termination is postmarked or from the date of personal service, whichever is applicable. If the Defaulting Party fails to give the notice required in this Sub-Paragraph, the Defaulting Party will be barred from seeking any relief, whether by way of action or defense, in any court, or otherwise, with respect to any matter or issue which was subject to the notice.

14.6   <u>Effect of Termination or Expiration</u>. On termination or expiration of this Agreement for any reason, all Licensee's rights associated with being an authorized licensee cease and the following, as well as any other provisions of this Agreement relating to termination or expiration, apply:

      a.     Licensor may terminate any lease or sublease entered into with Licensee for the Licensed Location, if any, or Licensor may exercise its option to acquire the lease for or purchase the Licensed Location;

      b.     Licensee must immediately and permanently discontinue the use of the Tuffy Marks, the Tuffy System or any marks, names or indicia confusingly similar thereto, or any other materials which may, in any way, indicate or tend to indicate that Licensee is or was a Licensee of Licensor, or in any way associated with Licensor, and if Licensee remains in possession of the Licensed Location, Licensee must alter the premises to distinguish the premises from the appearance of a Tuffy Auto Service Center;

      c.     Licensee must immediately discontinue all advertising placed or ordered. Licensee must remove and deliver to Licensor all technical manuals or Operations Manuals, all copyrighted material, all sign faces, advertising and promotional material, stationary, letterhead, forms and any other items bearing the Tuffy Marks. Licensee is responsible for the cost of sign and other identification removal and the cost of shipping signs and other materials to Licensor;

      d.     Licensor will have the right to have all telephone numbers for the Center transferred to a location of Licensor's choice and Licensee must assign those telephone numbers and take all other action necessary to effectuate this provision;

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

21

e.    Licensor will give Licensee credit for the fair market value at wholesale of all reusable material purchased from Licensor and returned to Licensor;

f.    In the event Licensee fails to remove, destroy or return any copyrighted material, signs, posters or advertisements bearing any of the Tuffy Marks as of the effective date of termination or expiration of this Agreement, Licensor or its agent may, and are authorized by this Agreement, to enter the Licensed Location and remove or paint over any and all such material, signs, posters or advertisements and Licensee waives and releases Licensor from any and all claims for damages resulting from those actions;

g.    Licensee must sell to licensor, F.O.B. Licensee's Center, all or such parts of Licensee's inventories or products on hand as of the date of termination or expiration that are uniquely identified with Licensor, if any, as Licensor may request in writing before or within thirty (30) days after the date of termination or expiration. The sales price will be the current published prices then being charged by the manufacturer to authorized licensees of Licensor, not including any cost of storage or transportation paid by Licensee to bring the goods initially to the Center, minus all costs incurred or to be incurred by Licensor to restore the goods or the packaging of the goods to a saleable condition, and minus a reasonable allowance for physical deterioration, obso- lescence, or damage to the extent not restored;

h.    All payments made by Licensee to Licensor, including payments for equipment, license fees, royalty, and advertising will be retained by Licensor. Termination or expiration will not lessen the liability of one party to the other for all sums and debts owed before termination or expiration unless a separate written agreement is made between the parties settling that liability;

i.    Termination or expiration of this Agreement will not lessen the liability or further obligations of Licensee pursuant to this Agreement relating to Licensor's option to purchase or lease Licensee's location or purchase Licensee's assets, restrictions on use of the Marks and the Systems, restrictions on disclosure and use of confidential information, restrictions on competition, or other obligations contained in this Agreement that by their terms or intent survive termination or expiration of this Agreement. Those obligations of Licensee will survive termination or expiration of this Agreement. Further, termination or expiration will not lessen Licensee's obligations to its customers. Licensee must reimburse Licensor for the cost of all warranties honored for work performed by Licensee.

Termination or expiration of this Agreement and/or enforcement of the provisions of this Paragraph will not affect or prejudice any other rights or remedies of Licensor for breach of this Agreement by Licensee whether those rights and remedies are contained in this Agreement or otherwise provided by law or equity.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

22

14.7  Damages for Loss of Bargain.  In addition to any other remedies available to Licensor, in the event this Agreement is terminated prior to its expiration (other than termination by Licensee for cause), Licensor will be entitled to recover from Licensee damages attributable to the loss of bargain resulting from that termination.  The parties stipulate and agree that the damages for Licensor's loss of bargain will be the present value of the royalty that would have been payable to Licensor for the balance of the term of this Agreement, but not more than thirty-six (36) months.  The parties agree that the aggregate amount of royalty that would have been payable will be calculated utilizing annual gross sales equal to the average annual gross sales of the Center for the two (2) year period [or such lesser period if the Licensee was not in operation for a full two (2) year period] immediately preceding the date of termination.  For the purposes of this Paragraph, gross sales will be calculated based on gross sales reported by Licensee or as actually determined by an audit of Licensee's business.  If Licensee has failed or refused to report gross sales for any part of its operation before termination, Licensor may reasonably estimate those gross sales.

The parties acknowledge and agree that the actual damages that will be sustained by Licensor if this Agreement is terminated before its expiration by Licensor for cause are incapable of calculation at the time of execution of this Agreement.  The parties further acknowledge and agree that the damages set forth in this Paragraph are a reasonable estimation of those damages.

## ARTICLE FIFTEEN - OPTION TO PURCHASE CENTER

15.1  Option.  On termination or expiration of this Agreement, except termination by Licensee for cause, Licensor will have the option, but not the obligation, exercisable for thirty (30) days from the date of valuation of the assets, to purchase the assets of the Center.  For purposes of this Paragraph, the assets of the Center means the equipment, inventory, leasehold interest, furnishings and other assets of the business licensed by this Agreement other than real estate owned by Licensee.

15.2  Purchase Price.  The purchase price will be the fair value of the assets as agreed on by the parties or in the absence of an agreement as determined by an independent qualified appraiser selected by Licensor and Licensee.  If Licensor and Licensee cannot agree on an independent appraiser, each will select an independent appraiser qualified or certified to make such appraisals.  The independent appraisers so chosen will then select a third independent appraiser.  The third independent appraiser will determine the fair value of the assets and his determination will be binding on the parties.  The date of valuation of the assets will be the date that the parties agree to the valuation or, if applicable, the date that a written valuation is received from the appraiser.  Subject to the reductions described below, the purchase price will be paid in full at closing.

15.3  Reductions of Purchase Price.  If Licensor elects to purchase the assets of the Center, the purchase price will be reduced by:

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

23

a.     the total current and long-term liabilities of the Center assumed by Licensor as described below; and

b.     any amounts due to Licensor from Licensee.

Licensor will assume all current and long-term liabilities of the Center (except liabilities to Licensee, its principals, officers, shareholders or affiliates) up to the amount of the purchase price, subject, however, to all defenses available to Licensee.

15.4   <u>Real Property</u>.  If Licensee owns the real property on which the Center is located, Licensor will also have the option to purchase this property for a period of thirty (30) days from the date of valuation of the real property.  The purchase price will be the fair value of the property as determined pursuant to the procedure specified in Paragraph 15.2 above.  The date of valuation will also be determined as described in Paragraph 15.2 above.  The purchase price will be paid in full at closing minus customary prorations including the pay-off of existing mortgage liens.  If Licensor does not elect to purchase the real property, Licensor or its designee will have the option to enter into a lease for a term of not less than five (5) years with an option by lessee to extend the term of the lease for an additional term of five (5) years.  The lease will contain the terms and conditions contained in the form of lease then used by Licensor in connection with Centers owned by Licensor, or in the absence of such a lease, on a form standard in the area of the Licensed Location.  The rental under the lease for the initial five (5) year term will be the fair rental value of the property as of the date of exercise of the option.  This fair rental value will be determined by an independent appraiser selected in the manner provided in Paragraph 15.2.  The rental during the second five (5) year option term will be the fair rental value of the property as of the date that is thirty (30) days before the end of the initial term.  That fair rental value will be determined by an independent appraiser selected in the manner provided in Paragraph 15.2.

15.5   <u>Closing</u>.  The closing will occur within sixty (60) days after Licensor exercises its option to purchase the assets and/or the real property or such later date as may be necessary to comply with applicable bulk sales or similar laws.  At closing, Licensor and Licensee agree to execute and deliver all documents necessary to vest title in the assets and/or real property purchased by Licensor free and clear of all liens and encumbrances, except those assumed by Licensor and/or to effectuate the lease of the Licensed Location.  Licensor reserves the right to assign its option to purchase the Center or designate a substitute purchaser for the Center if Licensor remains responsible for and guarantees compliance with the provisions of this Article.

15.6   <u>Operation During Option Period</u>.  Licensor will have the right, on written notice to Licensee, to manage the Center during the period in which Licensor has an option to purchase the Center and for the period following the exercise of the option by Licensor and before closing.  Licensor will be responsible for the debts of the Center during this period of management and may charge a reasonable fee to manage the Center, not to exceed five (5%) percent of gross sales of the Center.  This management fee is in addition to any royalty or advertising fund payments due to Licensor.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

24

## ARTICLE SIXTEEN - RELATIONSHIP OF PARTIES; INDEMNIFICATION

16.1    Independent Contractor.  Licensee is and will be considered an independent contractor with control and direction of its business and operations limited only by the conditions established by this License Agreement and the Operations Manual.  No agency, employment, partnership or joint venture is created by this Agreement and neither party has the right to act on behalf of the other.

16.2    Separate Identification of Business.  Licensee must identify its business as a separate business by filing an assumed name certificate as appropriate in the state of location of the Center.  Also, the Licensee must display signs, notices or plaques as specified by Licensor at the Licensed Location to identify the separate ownership of the business to the public.

16.3    Indemnification.  Licensee must indemnify and hold Licensor harmless from any and all claims, actions, demands, proceedings, lawsuits, damages or liabilities, and all expenses related thereto, including attorney fees and court costs, arising out of or in any way connected with conduct at the Licensed Location or the operation of Licensee's business.

## ARTICLE SEVENTEEN - LAW AND JURISDICTION; INJUNCTIVE RELIEF

17.1    Ohio Laws and Jurisdiction.  This Agreement and the construction of this Agreement will be governed by the laws of the State of Ohio (without reference to the conflict of laws provisions).  Any legal proceedings between the parties must be brought and conducted only in a state or federal court located in the county in which the Licensor's principal place of business is located except legal proceedings brought by Licensor to obtain possession of real and personal property from Licensee may, at Licensor's option, be brought in a state or federal court for the county in which Licensee's business is located.  Licensee consents to and waives any objections to jurisdiction and venue in the courts specified in this Paragraph.

17.2    Injunctive Relief.  The Licensor will have the right, without the posting of any bond or security, to apply for specific enforcement of the terms of this License Agreement, by petitions for temporary and permanent injunctions or other similar equitable relief.  Specifically, the Licensor will have the right to obtain such relief to prevent Licensee from:  (a) misusing any of the rights licensed by this Agreement; (b) engaging in competitive operations in derogation of the in-term and post-term covenants set forth in Article 12; (c) transferring or assigning this Agreement without complying with this Agreement; (d) engaging in acts or practices in violation of applicable laws and regulations or which are fraudulent, dishonest or create health or other hazards to the public; (e) failing to issue or honor warranties specified by Licensor; or (f) significantly impairing the goodwill associated with the Licensor.  Licensor's rights to apply for such relief are in addition to all other remedies available to Licensor under applicable law.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, II – John Dzluban, Jr.

25

ARTICLE EIGHTEEN - MISCELLANEOUS

18.1   Waiver: Cumulative Remedies.  No delay or omission to exercise a right, power or remedy accruing to one party on any default will impair any right, power or remedy of that party, and will not be construed to be a waiver of any default, or an acquiescence in any default, or in any similar default occurring later, nor will any waiver of any single default be deemed a waiver of any other default occurring before or after that default.  Any waiver, permit, consent or approval of any kind or character on the part of Licensor of any breach or default under this License Agreement or any waiver on the part of Licensor of any provision or condition of this License Agreement must be in writing signed by the President or Vice-President of Licensor and will be effective only to the extent specifically allowed by that writing. All remedies, either under this License Agreement, or by law, or otherwise afforded will be cumulative and not alternative.

18.2   Costs of Enforcement.  Licensee must pay all costs incurred by Licensor in enforcing the provisions of this Agreement, including, but not limited to, the cost of all telephone calls, telegrams, travel, legal expenses, including attorney fees, and correspondence.

18.3   Obligations Joint and Severable.  If there is more than one individual or entity executing this Agreement as Licensee, their obligations under this Agreement will be joint and severable.

18.4   Notice.  Any notice or demand given or made pursuant to the terms of this Agreement must be served as follows:

a.     if given to Licensor, it must be sent by registered or certified mail addressed to:

Tuffy Associates Corp.
1414 Baronial Plaza Drive
Toledo, Ohio   43615

or at any other address designated by Licensor by notice under this section; and

b.     if given to Licensee, it must be delivered or mailed by registered or certified mail to any of the persons designated in Item 3 of Appendix A or must be mailed by registered or certified mail to Licensee at the address of the Licensed Location.

18.5   Unavoidable Contingency.  Neither party will be responsible for any contingency that is unavoidable or beyond its control, including strike, flood, war, fire, rebellion, governmental limitation or Act of God.

18.6   Time of the Essence.  Time will be of the essence for provisions of this License Agreement requiring the payment of monies and opening of the Center.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

26

18.7    Risk of Operations; Representations.  Licensee recognizes the uncertainties inherent in all business ventures.  Licensee agrees and acknowledges that, except as specifically set forth in this Agreement or the Licensor's Offering Circular or the attached "Acknowledgement by Licensee of Disclosure Compliance Dates and Representations", no representations or warranties, express or implied, have been made to Licensee, either by Licensor or anyone acting on its behalf or purporting to represent it, including, but not limited to, the prospects for successful operations, the level of business or profits that Licensee might reasonably expect, the desirability, profitability or expected traffic volume or profit of the Center (whether or not Licensor assisted Licensee in the selection of the location of the Center).  Licensee acknowledges that all such factors are necessarily dependent upon variables beyond Licensor's control, including, without limitation, the ability, motivation and amount and quality of effort expended by Licensee.  Licensee further acknowledges that neither Licensor's sales personnel nor any employee or officer of the Licensor is authorized to make any claims or statements as to the earnings, sales profits, costs, expenses or prospects or chances of success that any Licensee can expect or that present or past Licensees have had.  Licensee agrees that it has not relied on and that Licensor will not be bound by allegations of any representations as to earnings, sales, profits, costs, expenses, prospects or chances of success.

18.8    Entire Agreement; Modifications.  This Agreement and all schedules and other documents attached to or incorporated by reference in this Agreement will constitute the full and entire Agreement between the parties.  This Agreement supersedes all previous written and oral agreements or understandings between the parties.  This Agreement will not be amended or modified other than by an instrument in writing executed by both parties, except as otherwise may have been specifically provided for in this Agreement.

18.9    Severability.  Each section, part or provision of this Agreement will be considered severable.  In the event that any section, part or provision is found unenforceable by a Court of competent jurisdiction, that determination will not impair the operation or effect the validity of the remainder of this Agreement.

18.10    Uniformity.  Licensee acknowledges that present or future licensees of Licensor may operate under different forms of license agreements and, consequently, that Licensor's obligations and rights with respect to its various licensees may differ materially in certain circumstances.

TUFFY ASSOCIATES CORP.

By: _____
      Keenan V. Moran, President

JOHN DZIUBAN, JR. _____
Licensee

By: _____
      John Dziuban, Jr.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

27

STATE OF OHIO             )

                               ) ss.

COUNTY OF LUCAS )

     On this _19th_ day of _October_, 19 _99_, before me, a Notary Public in and for said County, specifically appeared KEENAN V. MORAN, to me known to be the same person described in and who executed the within instrument and acknowledged the same to be his free act and deed.

                                  _____

                                  , Notary Public

_Lucas_ _____ County, Ohio

My commission expires:_____

                     **KAREN R. TAULBEE**
               Notary Public, State of Ohio
           My Commission Expires 7-24-2000

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

28

STATE OF *Ohio*     )
                    ) ss.
COUNTY OF *Lucas*   )

On this *10th* day of *October*_____, 19*99*, before me, a Notary Public in and for said County , specifically appeared <u>JOHN DZIUBAN, JR.,</u> to me known to be the same person(s) described in and who executed the within instrument and acknowledged the same to be his/her/their free act(s) and deed(s).

_____
                        , Notary Public
_____*Lucas*_____ County, *Ohio*_____
My commission expires:_____

**KAREN R. TAULBEE**
**Notary Public, State of Ohio**
**My Commission Expires 7-24-2000**

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

29

## <u>OBLIGATIONS OF INDIVIDUALS INVOLVED IN LICENSEE'S BUSINESS</u>

Each of the undersigned, being directly or indirectly beneficially interested in the business to be conducted by Licensee, under this License Agreement, and in order to induce Licensor to enter into this License Agreement and in consideration of Licensor entering into this License Agreement, joins in and agrees to be personally bound by all the terms and provisions of this Agreement, other than those requiring the payment of money by Licensee, to the same extent and in the same manner as Licensee is bound. This Paragraph will not impair any separate instrument of guaranty or subordination which any of the undersigned may have executed or may execute in the future.

JOHN DZIUBAN, JR.

REBECCA DZIUBAN

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

30

APPENDIX A

ITEM 1:  The location of the Center ("Licensed Location") or the geographic area in which said Center will be located is:

108 S. Larkin<br>
Joliet, IL  60436

ITEM 2:  The Protected Area referred to in Paragraph 1.2 is:

A two (2) mile radius around the Licensed Location.

ITEM 3:  The designated opening date of the Licensed Location, pursuant to Paragraph 8.5, is October 25, 1999.

ITEM 4:  The designated individual(s) ("Principals") under Paragraph 9.7 is/are:

John Dziuban, Jr.

Dated:  _10 /19 /99_

TUFFY ASSOCIATES CORP.

By: _____
       Keenan V. Moran, President

JOHN DZIUBAN, JR.
Licensee

By: _____
       John Dziuban, Jr.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

31

## LEGAL ENTITY FORM

THE UNDERSIGNED REPRESENT THAT THE FOLLOWING IS CORRECT AND TRUE:

1.    LEGAL NAME[1] _____ JOHN DZIUBAN, JR. _____

/XX/  a sole proprietorship

/___/  a corporation organized in the State of _____

/___/  a partnership

/___/  other entity (please designate) _____

d/b/a (if applicable)[2] _____ Tuffy Auto Service Center _____

ADDRESS _____ 108 S. Larkin _____

_____ Joliet, IL  60436 _____

BUSINESS TELEPHONE    815-741-1911 _____

2.    NAME, HOME ADDRESS/PHONE, TITLE, % OWNERSHIP

Name          John Dziuban, Jr. ____

Home
Address       3706 Theodore St. ____
              Joliet, IL  60431 ____

Phone         815-730-1680 _____

Title         Sole Proprietor _____

% Owner-
ship          100% _____

3.    ALL OWNERS MUST SIGN:

_____     Dated: 10-10-99
JOHN DZIUBAN, JR.

TUFFY ASSOCIATES CORP.
License Agreement/Illinois/July 1, 1999
Joliet, Il – John Dziuban, Jr.

NOTES:     (1) ALL LEGAL ENTITY DOCUMENTATION must be submitted to the Licensor prior to issuance of any imprinted material (business cards, invoices, warranties). If documentation is submitted at a later date, invoices will be imprinted with Licensee's personal name.

If the business is a partnership, a copy of the Partnership Registration must be submitted to the Licensor. If the business is a corporation, a copy of the Articles of Incorporation must be submitted to the Licensor. If the business is another entity, copies of any organizing documents or state filing must be submitted to Licensor.

(2) If using an assumed name or d/b/a (doing business as), a true copy of the registration from the state and/or county must be submitted to the Licensor.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## PERSONAL GUARANTY AND SUBORDINATION AGREEMENT

The undersigned, in order to induce TUFFY ASSOCIATES CORP. ("Licensor") to enter into a License Agreement, dated the __19th__ day of __Oct.__, 19__99__, with JOHN DZIUBAN, JR. ("Licensee"), unconditionally, jointly and severally:

1.     guaranty to Licensor, its successors and assigns, the prompt and full payment and performance of all obligations of the Licensee to Licensor including, without limitation, all obligations arising out of the License Agreement or any other agreement between the parties, such as leases, subleases, notes or security agreements, or out of purchases on open account;

2.     agree to pay to Licensor all costs and expenses, including reasonable attorney fees, incurred in enforcing this Guaranty;

3.     waive acceptance of this Guaranty by Licensor and waive presentment, demand for payment, protest, notice of dishonor and any other notice or demand of any kind and the necessity of Licensor instituting legal proceedings against the Licensee;

4.     consent that Licensor will have the right, without notice, to deal in any way at any time with Licensee or any other guarantor, or to grant any such party any extensions of time for payment of any indebtedness, or any other indulgences or forebearances whatever, without in any way affecting our personal liabilities;

5.     agree that any indebtedness by the Licensee to us, for any reason, currently existing, or which might arise after this Guaranty, will at all times be inferior and subordinate to any indebtedness owed by the Licensee to Licensor;

6.     agree that as long as the Licensee owes any monies to Licensor (other than payments that are not past due) the Licensee will not pay and the undersigned will not accept payment of any part of any indebtedness owed by the Licensee to us, or any one of us, either directly or indirectly, without the consent of Licensor;

7.     agree that this Agreement will be governed by the laws of the State of Ohio (without reference to the conflict of laws provisions) and that any legal proceedings to enforce this Agreement must be brought and conducted only in a state or federal court located in the county in which Licensor's principal place of business is located and the undersigned consent to those courts having jurisdiction over their persons; and

8.     agree that our obligations under this agreement are joint and severable.

Dated: __10-10-99__

_____
GUARANTOR – John Dziuban, Jr.

Dated: __10-10-99__

_____
GUARANTOR -- Rebecca Dziuban

TUFFY ASSOCIATES CORP.
Sublease SF/Illinois/July 1, 1999
John Dziuban, Jr. – Joliet, IL

## TUFFY ASSOCIATES CORP.
### SUBLEASE

THIS SUBLEASE is made this 19th day of _Oct_____, 1999, by TUFFY ASSOCIATES CORP., a Delaware corporation ("Sublessor") and JOHN DZIUBAN, JR. ("Subtenant").

1.   Leased Premises.  The Sublessor has previously entered into a Lease as Lessee/Tenant with Downers Grove National Bank, not personally, but as Trustee under Trust Agreement dated September 25, 1995 known as Trust No. 95-264, as Lessor/Landlord ("Landlord") dated the 21st day of March, 1995, a copy of which is attached ("Lease"), for the premises commonly known as 108 S. Larkin, Joliet, IL 60436 ("Premises").  Subtenant desires to sublease the Premises from Sublessor for the sole purpose of operating a Tuffy Auto Service Center franchise.

The Sublessor leases to Subtenant and Subtenant leases from Sublessor the Premises on the terms set forth in this Sublease.

2.   Term; Renewal.  The term of this Sublease will begin on the 25th day of October, 1999, and end on the 4th day of January, 2011, unless sooner terminated as set forth in this Sublease.  However, the term of this Sublease will not extend beyond the term of the Lease.

If Subtenant is not then in default under this Sublease, and if Sublessor has rights as a Lessee/Tenant under the Lease, Subtenant will have the option to extend the term of this Lease for two (2) additional and consecutive terms of five (5) years each on all the same terms and conditions provided in this Sublease.  Subtenant must exercise a renewal option by giving Sublessor written notice of election not less than one hundred eighty (180) days before the prior term of the Sublease expires.

3.   Rent.  Subtenant must pay to, or on the order of, the Sublessor, as rent for the Premises:

a.   the rent required to be paid by Sublessor under the Lease from and after the commencement date of this Sublease, including all base and per-centage rent, and any increases in rent, plus a charge equal to five percent (5%) of the rent;

b.   all other charges required to be paid by Sublessor under the Lease from and after the commencement date of this Sublease, payable on the dates specified in the Lease for the payment of those charges; and

c.   a monthly amount to be escrowed for real property taxes which will be adjusted annually but will be no more than 1/12th of the real property

TUFFY ASSOCIATES CORP.
Sublease SF/Illinois/July 1, 1999
John Dziuban, Jr. – Joliet, IL

1

PLAINTIFFS' EXHIBIT B

taxes for the previous calendar year. The beginning real property tax escrow will be <u>Five Hundred Twenty-four and 35/100</u> (<u>$524.35</u>) Dollars per month.

      d.     a monthly amount to be escrowed for insurance which will be adjusted annually but will be no more than 1/12th of the insurance for the previous calendar year. The current amount to be escrowed <u>is Forty-five and 00/100</u> (<u>$45.00</u>) Dollars per month.

Rent, tax escrow and insurance escrow must be paid without notice or any prior demand from Sublessor and without any deduction or set-off. Rent must be paid in equal monthly installments with the first month's rent payable on the date of execution of this Sublease and then no later than five (5) days before the first day of each month, in advance. The monthly tax and insurance escrow payments will be due on the same day as the rent payment is due. The escrowed amounts will be applied to taxes and insurance due and any deficiency must be paid by Subtenant within fifteen (15) days of written notice from Sublessor. If the term of this Sublease commences on a day other than the first day of a calendar month, then the rental, tax escrow, and insurance escrow payments for the initial month will be prorated on a daily basis based upon a thirty (30) day calendar month.

      4.    <u>Incorporation of Lease</u>. Except as expressly modified by the terms of this Sublease, all the terms and provisions of the Lease are incorporated by reference and made a part of this Sublease, and the parties agree to be bound by those terms. For purposes of incorporation of the Lease into this Sublease, whenever the term "Tenant" or "Lessee" or an equivalent term is used in the Lease, the term "Subtenant" will be substituted; and whenever the term "Landlord" or "Lessor" or an equivalent term is used in the Lease, the term "Sublessor" will be substituted.

      The parties acknowledge and agree that any obligations of the Lessor under the Lease relating to construction, reconstruction, improvement or maintenance of the Premises, or relating to the Tenant's exclusive right to operate a particular type of business, are undertakings of the Lessor under the Lease, and the Sublessor will not be responsible to Subtenant if the Lessor under the Lease fails to perform those obligations. Also, without limiting the generality of this Paragraph 4, Subtenant will be responsible to perform all obligations of Tenant under the Lease relating to construction, reconstruction, repair and maintenance, unless otherwise agreed by the parties or unless otherwise previously performed by Sublessor, but Sublessor must pre-approve any construction plans.

      The parties also acknowledge and agree that Subtenant will not have the right to exercise any right or privilege of the Tenant under the Lease relating to options to purchase the Premises, rights of first refusal to purchase the Premises or construction, alteration, re-modeling, reconstruction, restoration or re-building of improvements on the Premises. Unless otherwise agreed by Sublessor, those rights may only be exercised by Sublessor for Sublessor's benefit.

      5.    <u>Subtenant's Covenants</u>. Subtenant must occupy the Premises in accordance with the Lease Agreement and this Sublease Agreement, and must not do anything or fail to

do anything that may result in a violation of or default under any of the terms and conditions of the Lease or this Sublease or render the Sublessor liable for any charge or expense under the Lease.

6. <u>Indemnity</u>. Subtenant must defend, indemnify and hold harmless Sublessor from and against any penalty, damage or charge imposed for any violation of any law or ordinance whether or not caused by the neglect of Subtenant or those holding under Subtenant. Subtenant must defend, indemnify and hold harmless Sublessor and Landlord from and against all claims, loss, cost, damage or expense arising out of or from any accident or other occurrences on or about the Premises causing injury to any person or property or out of any failure of Subtenant in any respect to comply with and perform all the requirements and provisions of this Sublease or the Lease. For purposes of this indemnity, as to Sublessor, Subtenant waives any immunity which it has from injuries to its employees as an employer in compliance with any applicable workers' compensation laws.

7. <u>Hazardous Materials</u>. Subtenant must not emit, produce or handle any "hazardous waste," "hazardous substance" or "hazardous materials" as those terms are defined under applicable federal, state or local law or regulation, in violation of any of such laws or regulations. Subtenant must dispose of any hazardous waste, substance or materials in compliance with such laws and regulations, and must not store, maintain or dispose of any hazardous waste, substance or materials in or on the Premises.

Subtenant must not use or install any underground storage tanks on the Premises without the prior written consent of Sublessor and Landlord. If Subtenant receives consent, Subtenant must carry, at its own expense, liability and environmental insurance specifically covering the underground storage tanks in amounts specified by Sublessor and Landlord. This insurance must be maintained during the term of this Sublease and must name Sublessor and Landlord as additional insureds.

Subtenant must defend, indemnify and hold harmless Sublessor, any successors to Sublessor's interest in this Sublease, Landlord, and Sublessor's directors, officers, employees, agents and contractors from and against any losses, claims, damages (including consequential damages), penalties, liabilities, costs (including cleanup and recovery costs), and expenses (including expenses of litigation and reasonable attorney fees) resulting from (1) any breach of the covenants of this Paragraph 7; or (2) any violation by Subtenant of any federal, state or local environmental law, rule, regulations, statute or ordinance, whether on-site or off-site in nature.

8. <u>Default</u>. In addition to any provisions regarding default contained in the Lease, which are incorporated in this Sublease by reference, Subtenant will be in default under this Sublease on the occurrence of any of the following events:

a. a breach by Subtenant of any provision of the License Agreement entered into between Tuffy Associates Corp. and Subtenant in connection with the Tuffy Auto Service Center to be operated at the Premises ("License Agreement") or the expiration, non-renewal or termination of the

TUFFY ASSOCIATES CORP.
Sublease SF/Illinois/July 1, 1999
John Dziuban, Jr. – Joliet, IL

3

License Agreement for whatever reason, or the occurrence of an event that gives Tuffy Associates Corp. the right to terminate the License Agreement whether or not the License Agreement is in fact terminated or the default of Subtenant or any corporation, partnership, limited liability company or other entity owned by subtenant or the owners of Subtenant, under any other agreement entered into with Tuffy Associates Corp.;

      b.    the termination or cancellation of the Lease;

      c.    failure of Subtenant to pay any amounts due under this Sublease for a period of ten (10) days;

      d.    any breach by Subtenant of any other provisions of this Sub-lease, which breach is not cured within ten (10) days of written notice from Sublessor;

      e.    the commission or omission of any act by Subtenant that creates or constitutes an event of default by the Sublessor under the Lease;

      f.    abandonment of the Premises by Subtenant;

      g.    any assignment by Subtenant for the benefit of creditors whether by trust, mortgage or otherwise; and

      h.    a petition or other proceeding by or against the Subtenant for, or the appointment of, a trustee, receiver, guardian, conservator or other liquidator of Subtenant, with respect to all or substantially all of Subtenant's property.

If Subtenant is in default under this Sublease, in addition to any rights or remedies provided in the Lease, Sublessor may enter upon the Premises without further demand or notice to Subtenant and resume possession either by summary proceedings, or by action at law or in equity, or otherwise, as Sublessor may determine, without being liable for trespassing or for any damages. In no event will Sublessor's re-entry or resumption of possession or re-letting be deemed to be an acceptance, surrender or termination of this Sublease or waiver of the rights or remedies of Sublessor under this Sublease unless notice of acceptance, surrender or termination of this Sublease is set forth in a writing signed by Sublessor. In case of any default and re-entry by Sublessor, Sublessor may relet the Premises for the remainder of the Sublease term for the highest rent attainable and may recover from the Subtenant any deficiency between the amount obtained and the rent provided in this Sublease. Subtenant must also pay Sublessor reasonable attorney fees and the reasonable costs incurred by Sublessor in connection with Subtenant's default.

      9.   <u>Termination on Assignment of Lease</u>. The parties agree that if the Landlord consents to an assignment of the Lease from Sublessor to Subtenant, the Sublessor will have the option to assign all its rights and obligations under the Lease to Subtenant. If Sublessor exercises its option, Subtenant must accept the assignment and assume all obligations of

Sublessor under the Lease. On execution of an appropriate assignment and assumption of the Lease by the parties, and a consent by the Landlord on terms acceptable to Sublessor, this Sublease will terminate.

10.  Deposit.  Subtenant must deposit with the Sublessor, on or before April 15, 2000, a security deposit of Four Thousand Six Hundred Sixty-four and 35/100 ($4,664.35) Dollars as security for Subtenant's obligations under this Sublease. If Subtenant fails to pay rent or other charges due under this Sublease, or otherwise defaults under this Sublease, the Sublessor may use, apply or retain all or any portion of the deposit for the payment of any rent or other charge in default or for the payment of any other sum for which the Sublessor may become obligated because of Subtenant's default, or to compensate the Sublessor for any loss or damage that the Sublessor may incur because of Subtenant's default. If the Sublessor uses or applies all or any portion of the deposit, Subtenant must, within ten (10) days after written demand, deposit cash with the Sublessor in an amount sufficient to restore the deposit to the full amount stated above and Subtenant's failure to do so will be a material breach of the Sublease. The Sublessor will not be required to keep the deposit separate from its general accounts. If Subtenant performs all of Subtenant's obligations under this Sublease, the deposit, or the portion that has not been applied by the Sublessor, will be returned, without payment of interest, to Subtenant (or at the Sublessor's option, to the last assignee, if any, of Subtenant's interest) within ninety (90) days after this Sublease expires. No trust relationship is created between the Sublessor and Subtenant with respect to the security deposit.

11.  Use and Operation of Premises.  The Premises must be occupied and used solely for the operation of a Tuffy Auto Service Center, and for no other purpose. This provision will be strictly enforced, if necessary, by an injunction issued by a court of competent jurisdiction.

Subtenant agrees:

a.  to load or unload all inventory, merchandise, supplies, fixtures, equipment and furniture and to cause the collection of rubbish only through the rear service door or doors of the Premises, to the extent possible;

b.  to keep the Premises in a careful, safe, clean and proper manner;

c.  to prevent the Premises from being used in any way that would injure the reputation of the Premises or that could be a nuisance, annoyance, inconvenience or could cause damage to the neighborhood, including, without limiting the generality of the foregoing, noise by the playing of any musical instrument or radio or television or the use of a microphone, loud speaker, electrical equipment or other equipment outside of the Premises; and

d.  to abide by all reasonable rules and regulations established by Landlord or Sublessor, from time to time, with respect to the Premises.

Subtenant agrees to keep and maintain in good order, condition and repair the Premises, and every part of the Premises, including, but without limitation, all driveways and parking areas, the exterior walls and roof, exterior and interior portions of all doors, door-checks, windows, plate glass, all plumbing and sewage facilities within the Premises, all fixtures, electrical equipment and interior walls, floors and ceilings, including compliance with applicable building codes relative to fire extinguishers. Subtenant must pay all costs and assume all responsibility for replacing any portion of the Premises if required during the term or any renewals of this Sublease. Subtenant must preserve the good order and condition of the Premises and maintain the Premises in the best possible manner.

If Subtenant neglects or refuses to maintain, repair or keep up any of the Premises as required by this Sublease, Sublessor may, at its option, without liability for forfeiture, have such repairs made and add the actual cost of the repairs to the next rent payment due from Sublessor.

Subtenant acknowledges that he has inspected the Premises and accepts them "AS IS."

12.   Assignment.  Subtenant must not assign  or in any manner transfer this Sublease or any interest in this Sublease, or permit occupancy by anyone other than Subtenant without the previous written consent of Sublessor.  Any assignment must be made only to a franchisee of Tuffy Associates Corp.  Subtenant must not sublet the Premises or any part of the Premises.

13.   Alterations.  Subtenant must not make alterations, additions or improvements to the Premises without the prior written consent of the Sublessor.  All alterations must be in accordance with the specifications for a Tuffy Auto Service Center as specified by Tuffy Associates Corp.  All alterations, additions and improvements will become the property of Sublessor or the Landlord (as determined by the Lease Agreement) upon the expiration or termination of this Sublease Agreement.

14.   Corporate or Partnership Tenant.  If Subtenant is or becomes a partnership, corporation or other entity, or if this Sublease is assigned to a partnership, corporation or other entity, all general partners, shareholders or other owners must execute this Sublease and be bound jointly and severally by all the provisions of this Sublease.  The signatories to this Sublease represent and warrant that they are the sole proprietor of Subtenant or all of the persons required to sign this Sublease pursuant to this Paragraph.

15.   Right of Entry.  Landlord and Sublessor will have the right to enter the Premises during reasonable business hours to examine the Premises or to make repairs or alterations as they deem necessary or to exhibit the Premises to prospective purchasers or lessees. Sublessor will also have all rights to enter the Premises as provided in the License Agreement referred to in Paragraph 8(a) above.

16.   Insurance.  Sublessor will pay all insurance premiums for insuring the Premises with respect to All Risk Fire and extended coverage, rents insurance and lessor's risk coverage,

including, but not limited to, vandalism and malicious mischief. Subtenant must reimburse Sublessor for the cost of that insurance as outlined in Paragraph 3(d) above. Subtenant will also be responsible for any deductible.

Subtenant, at its expense, must maintain comprehensive general liability and garage liability insurance including, but not limited to, premises liability and contractual liability, in connection with the Premises, with a combined single limit of One Million ($1,000,000) Dollars for property damage and bodily injury, and automobile liability coverage in an amount not less than One Million ($1,000,000) Dollars, during the term of this Sublease, including any renewals. Subtenant also must carry All Risk Plate Glass insurance coverage, naming Sublessor and Landlord as loss payees as their interest may appear. Subtenant must also carry Garagekeepers' legal liability insurance coverage, in an amount not less than One Hundred Thousand ($100,000) Dollars. Subtenant also must carry personal property and equipment insurance, at replacement cost, naming Sublessor as loss payee as its interest may appear. All insurance coverage must be written on an occurrence form. Sublessor and Landlord must be named as additional insureds on all liability insurance policies of Subtenant. Subtenant must provide Sublessor with certificates of insurance and renewals on all policies, and each certificate must provide for a sixty (60) day prior notice to Sublessor in the event of cancellation or material change of coverage. If Subtenant fails to procure any insurance, Sublessor may, at its election, obtain that insurance and add the cost of the insurance to the next installment of rent due from the Subtenant.

Subtenant must carry workers' compensation and employers' liability coverage in compliance with the law of the state of location of the Premises at all times during the term of this Sublease, including any renewals, and must provide proof of coverage to Sublessor on request.

Sublessor and Subtenant release each other from any and all liability or responsibility (to the other or anyone claiming through or under them by way of subrogation or otherwise) for any bodily injury, loss or damage to property caused by fire or any of the extended coverage or supplementary contract casualties, even if the fire or other casualty has been caused by the fault or negligence of the other party, or anyone for whom the party may be responsible; provided, however, that this release will only apply if Sublessor's and/or Subtenant's coverage for the loss or damage is not adversely affected by this Sublease; and provided further that this release will only apply to losses for which Sublessor or Subtenant are compensated by their respective insurers.

17. **Dispute Resolution: Controlling Law: Venue.** Any provision of the Lease requiring the arbitration of disputes will not be incorporated by reference into this Sublease. Each party will have the right to pursue all its available legal or equitable remedies in a court of competent jurisdiction unless the parties otherwise agree in writing. This Sublease will be governed by and construed in accordance with the laws of the State of Ohio (without reference to the conflict of laws provisions) except that the laws of the state in which the Premises are located shall control as to an action for recovery of possession by the Sublessor of the Premises. Any legal proceedings between the parties, other than an action for repossession of the Premises by Sublessor, must be brought and conducted only in a state or federal court

located in the county in which the Sublessor's principal place of business is located and Subtenant consents to such courts having jurisdiction over its person.

18.    Notices. Any notice, demand or request that may be or is required to be given under this Sublease must be sent by First Class Mail to the addresses set forth below or any other address as may be designated by notice under to this Paragraph.

Sublessor:

Tuffy Associates Corp.
1414 Baronial Plaza Drive
Toledo, Ohio   43615

Subtenant:

John Dziuban, Jr.
Tuffy Auto Service Center
108 S. Larkin
Joliet, IL  60436

19.    Miscellaneous. The following additional provisions apply to this Sublease:

a.    Agreement Binding. This Sublease is binding on the heirs, executors, administrators, successors and assigns of the parties;

b.    Modification. This Sublease may be amended or modified only by an agreement in writing between all parties;

c.    Costs of Enforcement. Subtenant must pay all costs incurred by Sublessor in enforcing the provisions of this Sublease, including, but not limited to, the cost of all phone calls, travel and legal expenses, including attorney fees;

d.    Waiver. The failure of any party to demand strict compliance with a covenant or condition of this Sublease will not be a waiver of its rights to demand strict compliance with this Sublease in the future;

e.    Titles and Captions. All paragraphs, titles or captions are for convenience only and will not be deemed part of the context of this Agreement;

f.    Counter Parts. This Agreement may be executed in two (2) or more counter parts, each of which will be deemed an original; and

g.    Pronouns and Plurals. All pronouns and variations thereof will be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

TUFFY ASSOCIATES CORP.
Sublease SF/Illinois/July 1, 1999
John Dziuban, Jr. -- Joliet, IL

8

In the Presence of:

_Marilyn R. Baker_

_Nannette Morah_

_Bridgitte Newman_

TUFFY ASSOCIATES CORP.,
Sublessor

By: _Keenan V. Moran_

Keenan V. Moran, President

JOHN DZIUBAN, JR.,
Subtenant

By: _John Dziuban, Jr._

John Dziuban, Jr.

**PLAINTIFFS' EXHIBIT C**

*NON-CANCELABLE*
Equipment Lease Agreement                 Lease No. ___764015___



**THE BANCORP GROUP, INC.**
23155 NORTHWESTERN HWY.
SOUTHFIELD, MI 48075
(248) 827-2800  FAX (248) 827-2801
e-mail: bancorp@bancorpgroup.com

Dear Lessee: We've written this Equipment Lease Agreement in simple and easy-to-read language because we want you to understand its terms. Please read your Agreement carefully and feel free to ask us any questions you may have about it.  Lessee shall sign in all shaded areas only.

| Lessee Name | | Street | Telephone Number |
|---|---|---|---|
| JOHN J. DZIUBAN, JR. D/B/A TUFFY AUTO SERVICE CENTER | | 3206 THEODORE STREET | 815-741-1911 |
| City | County | State | Zip Code |
| JOLIET | | IL | 60431 |
| Supplier Name | | Street | Telephone Number |
| TUFFY ASSOCIATES CORP. | | 1414 BARONIAL PLAZA DRIVE | 419-865-6900 |
| City | State | Zip Code | Attention |
| TOLEDO | OH | 43615 | |

1.  **Equipment Lease Agreement ("Lease")**  Lessor agrees to lease to Lessee and Lessee agrees to lease from Lessor the Equipment listed below or on Schedule A. Lessee promises to pay Lessor the Lease payments shown below according to the payment schedule shown below.

| Quantity | Description of Equipment Leased | Make & Type | Model Number | Serial Number |
|---|---|---|---|---|
| | SEE THE SCHEDULE "A" ATTACHED HERETO AND MADE A PART HEREOF. | | | |

Equipment is new unless otherwise noted as: ☐ used  ☐ reconditioned
Equipment location, if other than Lessee's address shown above.

| Street | City | County | State | Zip code |
|---|---|---|---|---|
| 108 S. Larkin | Joliet | Will | Il. | 60436 |

2.  **Term and Lease Payment Schedule:**

| Number of months | Amount of monthly payments | |
|---|---|---|
| 60 | $3,869.00 | *Payments are due monthly, beginning _____ and continuing on the same day of each following month until fully paid.* |

Your lease payments shown above do not include any applicable tax. If any taxes are due, you agree to pay the tax in addition to your monthly payments. Lessee also agrees to pay the following at the time Lessee signs this lease. The Lease Payments shall be adjusted proportionally upward or downward if the actual cost of the Equipment exceeds or is less than the estimate and Lessee authorizes Lessor to adjust the Lease Payments by up to fifteen percent (15%) in that event:
☒ An advance payment of $ 7,738.00    ☐ A security deposit of $ _____    Federal Tax ID # _____

**THIS LEASE IS NON-CANCELABLE** and consists of all the terms on the front and back of this Agreement and on the Delivery and Acceptance Certificate. This Lease cannot be modified except by a written agreement signed by the Lessee and by the same Bancorp representative who signed the Lease. Lessee acknowledges receipt of a copy of this Lease.  Lessee also agrees that the Equipment is for business purposes only and will not be used for personal, family or household purposes. **This is not a consumer lease.**

| THE BANCORP GROUP, INC., Lessor | LESSEE, Signature |
|---|---|
| Accepted on ___10/22___ 19 _99_ | Dated _10-22-99_ 19 _99_ |
| By _____  Title _EVP_ | By _____ |
| | Title _____  JOHN J. DZIUBAN, JR.  OWNER |

**Personal Guarantee**
In the Guarantee, "I" or "Me" means the person making the Guarantee. I acknowledge that I have read and I understand the Lease Agreement and in consideration for and in order to induce Lessor to enter into the Lease, I unconditionally guarantee that the Lessee will make all Lease payments and pay all the other charges required under the Lease when they are due and will perform all other obligations under the Lease fully and promptly. I also agree that the Lessor may make other arrangements with the Lessee and I will still be responsible for those payments and other obligations. Lessor does not have to notify me if the Lessee is in default. If Lessee defaults, I will immediately pay in accordance with the current provisions of the Lease all sums due under the original terms of the Lease and I will perform all other obligations of Lessee under the Lease. I will reimburse Lessor for all the expenses Lessor incurs in enforcing any of Lessor's rights against the Lessee or me, including attorney's fees, as provided in the Lease. I agree that Lessor may proceed against me first without proceeding against the Lessee, other Guarantors, or the Equipment, and I waive any right to require otherwise. I understand that the Lease terms render me without set-offs or counterclaims against the Lessor. In consideration for the lease rate, and in order to induce Lessor to enter into the Lease, I CONSENT TO THE PERSONAL JURISDICTION AND VENUE OF ANY COURT LOCATED IN THE COUNTY OF OAKLAND, STATE OF MICHIGAN, and I WAIVE ALL OBJECTIONS BASED UPON IMPROPER JURISDICTION, VENUE, OR FORUM NON-CONVENIENS. ALL LEGAL ACTION RELATING IN ANY WAY TO THE LEASE OR THE EQUIPMENT SHALL BE COMMENCED IN OAKLAND COUNTY, MICHIGAN. (This forum selection provision shall not prohibit Lessor from pursuing legal action in any other court where jurisdiction may be proper.)
**I AND LESSOR HEREBY WAIVE ANY RIGHTS TO A TRIAL BY JURY.**

**Personal Guarantee**  (do not include title)

| Guarantor's Signature | Social Security No. |
|---|---|
| | |
| Type Name | |
| | , an individual |
| Home Address | |
| Home Phone | Dated _____ , 19 |

**Personal Guarantee**  (do not include title)

| Guarantor's Signature | Social Security No. |
|---|---|
| | 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 |
| Type Name | |
| JOHN J. DZIUBAN, JR. | , an individual |
| Home Address | |
| 3206 THEODORE STREET, JOLIET, IL  60431 | |
| Home Phone | Dated _10-22_ 19 _99_ |
| 815-730-1680 | |

AS TO SUBLESSOR:

STATE OF OHIO )
) ss.
COUNTY OF LUCAS )

The foregoing instrument was acknowledged before me this _9 th_ day of _October_, 1999, by KEENAN V. MORAN, President of TUFFY ASSOCIATES CORP., on behalf of said Corporation.

_Karen R. Taulbee_

**KAREN R. TAULBEE**
**Notary Public, State of Ohio**
**My Commission Expires 7-24-2000**

AS TO SUBTENANT (if individual(s)):

STATE OF _Ohio_ )
) ss.
COUNTY OF _Lucas_ )

The foregoing instrument was acknowledged before me this _10th_ day of _October_, 19 99, by John Dziuban, Jr.

_Karen R. Taulbee_

**KAREN R. TAULBEE**
**Notary Public, State of Ohio**
**My Commission Expires 7-24-2000**

## PERSONAL GUARANTEE

The undersigned individuals represent and warrant that they are all of the shareholders, partners or other owners of Subtenant or otherwise have a direct or indirect beneficial interest in the success of Subtenant. Accordingly, to induce the Sublessor to enter into this Sublease, each of the undersigned individuals jointly and severally guarantees the performance of Subtenant's obligations under this Sublease and each of the undersigned individuals jointly and severally agrees to be bound by all of the provisions of this Sublease.

_____
John Dziuban, Jr.

_____
Rebecca Dziuban

_____

_____



**THE BANCORP GROUP, INC.**
23155 NORTHWESTERN HWY.
SOUTHFIELD, MI 48075
(248) 827-2800 FAX (248) 827-2801
e-mail: bancorp@bancorpgroup.com

*NON-CANCELABLE*
*Delivery and Acceptance Certificate*  Lease No.  764015

The undersigned certifies that the Lessee has selected, received, inspected, and accepted all the equipment described either in the Equipment Lease Agreement ("Lease") between The Bancorp Group, Inc. (Lessor) and the Lessee, dated  10/22 ,19 99 or in the related Schedule A. The Equipment conforms with the Lessee's requirements and it has been fully installed and is in good working order. Lessee understands that Lessor is relying upon this Certificate as a condition for purchasing the leased Equipment from the Vendor. Lessee further understands that once it accepts the Equipment, Lessee can no longer revoke its promises to the Lessor, and that all lease payments and associated charges will be due despite dissatisfaction with the Equipment for any reason.

**Insurance:** Until this Lease is paid in full and all Equipment has been returned to Lessor, Lessee agrees to keep the Equipment insured at Lessee's expense against all risks of loss or damage from any cause whatsoever. Lessee agrees that such insurance coverage shall be for not less than the unpaid balance of the Lease plus the then-current fair market value of the Equipment. Lessee also agrees that the insurance shall be in such an additional amount as is reasonable to cover Lessor for public liability and property damage arising from the Equipment or Lessee's use of it. Each policy shall provide that the insurance cannot be cancelled without thirty days prior written notice to Lessor. Such insurance policies and the proceeds therefrom shall be the sole property of the Lessor and Lessor shall be named as an additional insured in all such policies and as sole loss payee in the policies insuring the Equipment. Lessee agrees to furnish proof of each insurance policy including a certificate of insurance and a copy of the policy. The proceeds of such insurance shall be applied at our sole election toward the replacement or repair of the Equipment or payment toward Lessee's obligations under the Lease. Because of increased risks to Lessor when Lessee has not insured as described above, Lessee agrees to pay to Lessor a monthly risk charge stipulated and liquidated at 1/2 % of Lessor's equipment cost until Lessee provides proof of compliance with these insurance requirements. In spite of the payment of such risk charge, Lessee has no right or claim to any insurance benefits from Lessor. Lessee is still liable for all losses, and such risk charge is not in lieu of the insurance requirements of this Lease.

Lessee has reviewed and understands all of the terms and conditions of the entire Lease Agreement and that all pages are legally binding, including this Delivery and Acceptance Certificate. Lessee warrants that all signatures are genuine, and that only a duly authorized representative of Lessee has executed this Lease. Lessee was not induced to sign this by any assurances of the Lessor or anyone else. Lessee acknowledges receipt of a copy of the entire Lease, consisting of 4 or more pages.

**The Vendor (Supplier) and its representatives are not agents of the Lessor, and they have no authority to waive, vary, or alter any of the terms or conditions of the Lease Agreement.** There are no side agreements or cancellation clauses given outside of the Lease. Lessee understands that the only agreements binding on Bancorp are those signed by the **same Bancorp representative** who signed the Lease and Lessee will not rely on any agreements signed or spoken by others.

Equipment Delivery Date _____

Lessee Name  JOHN J. DZIUBAN, JR. D/B/A TUFFY AUTO SERVICE CENTER

By _____
      JOHN J. DZIUBAN

Title  OWNER
(If corporation, give title. If owner or partner, state which)

| FOR LESSOR'S USE ONLY - VERIFICATION OF EQUIPMENT ACCEPTANCE: |
|---|
| Verification of Equipment Acceptance and Authorization to Purchase Equipment: |
| Given By: _____ |
| To: _____  Date: _____ |

**REQUEST FOR ELECTRONIC PAYMENTS**

Lessee hereby requests and authorizes Lessor to initiate debit and/or credit entries in connection with this Lease to the Depository Account designated below and authorizes the Depository Financial Institution (DFI) designated below to debit and/or credit same to such account. This authority is to remain in full force and effect until Lessor has received written notification, return receipt requested, from Lessee of its termination in such time and in such manner as to afford Lessor and DFI a reasonable opportunity to act on it.

Name of DFI

DFI Transit/ABA No.                              Account No.

Authorized Signature of Lessee:
X

*Please attach voided deposit ticket or cancelled check.*

SCHEDULE 1(a)

Joliet

Equipment

| | |
|---|---|
| neon sign | vice |
| outside sign | grinder |
| T.V. Set | air compressor twin 80 gallon |
| alarm system | welder gas |
| phone | welder electric |
| Visa machine | pallett racking |
| register (cash) | nut and bolt bins (full) - 2 |
| computer | saw zall |
| Coke machine | spring compressor (strut) |
| counter | Ban Pierson Bender |
| 3 fire extinguishers | Amco Lathe |
| ladder | tool carts |
| 2 desks | air conditioning evacuator |
| 5 chairs | jack stands - tall - 2 |
| radio system | ignition cabinets - 2 |
| catalog rack | holsts - 4 |
| file cabinets |     3 - Twin position |
| |        side by side |
| |     1 - split axle truck rack |
| | hose reels |
| | 2 way radio system |

B:\08803\MS03226A.TAL



# THE BANCORP GROUP, INC.

OPTION TO PURCHASE AMENDMENT
Lease # 764015

This option is Incorporated as part of the Lease dated as of _10-22-99_ ,1999 between ~~Curomed, Inc.~~, Lessee., and the Bancorp Group, Inc., Lessor.
_John J. Dziuban (M)_

1.  Lessee shall have the option to purchase the goods described in the Lease or Schedule annexed thereto at the expiration of the original term of said Lease. This option may be exercised before the expiration of the original term of the Lease, provided that all Lease payments have been made in full on or before the due dates, with the written consent of Lessor.  Option price shall be as a whole and not in part, and on as-is where-is basis.

    OPTION PRICE ***************$18,100.00**************************
    plus any applicable taxes and fees.

2.  Notice of the exercise of this option shall be given to Lessor in writing not less than ninety (90) days and not more than one hundred and twenty (120) days prior to the rent termination date set forth in the Lease. This option can not be exercised when the lease is in default in accordance with the terms of the Lease.

3.  This option shall be available to Lessee only if all of the following conditions have been satisfied in total, time being of the essence:

    (a) all  rental payments must have been made on or before the due dates,
    (b) all taxes (property, sales and use) must have been paid on or before the due dates, and
    (c) all other terms and conditions of the Lease have been occasioned by the Lessee.

4.  This option shall not be transferrable by the Lessee without the prior written consent of the lessor and the written acknowledgement of the Lessee's assignee of the terms of this Option.

_John J. Dziuban (M)_

LESSEE: ~~Bardstown Fitness & More, Inc.~~  LESSOR: THE BANCORP GROUP, INC.

BY: _John Dziuban_          BY: _____

NAME: John J. Dziuban        NAME: GARY A. VETTER

TITLE: Owner              TITLE: EXECUTIVE VICE PRESIDENT

DATE: _10-22-99_           DATE: _____

To:    The Bancorp Group, Inc.
23155 Northwestern Hwy.
Southfield, MI 48075

Re:    Lease No. 764015
John J. Dziuban, Jr. d/b/a
TUFFY AUTO SERVICE CENTER
3706 Theodore Street
Joliet, IL 60431

To Whom It May Concern:

This letter will certify that the driver's license shown below is a genuine copy of the original issued to me by the state motor vehicle authorities.



Sincerely,

Signature: _____ Date: 10-22-99
John J. Dziuban, Jr.



# THE BANCORP GROUP, INC.

The Bancorp Group, Inc., offers two Lease payment methods. Please review the methods and make your selection.

## Method 1: Bank Draft System (EFT)

If you wish to have your monthly payments drafted from your checking account, simply fill out the REQUEST FOR ELECTRONIC PAYMENTS at the bottom of the inside cover of your Equipment Lease Agreement. The completing of this section gives you the following advantages:

> No bill each time a lease payment is due;
> Postage savings because you do not mail a check;
> No risk of forgetting or misplacing an invoice;
> Reduce the risk of late charges.

## Method 2: Monthly Invoicing

The Bancorp Group, Inc. will mail to your billing address a monthly invoice for the amount of your Lease payment(s). The cost to the Lessee for remitting a monthly invoice will be Five dollars ($5.00) each billing period for the term of the Lease(s) or until all Lease(s) payments have been made.

Please make your selection:

_____    **Method 1: Bank Draft System (EFT)**

___✗___    **Method 2: Monthly Invoicing**

**LESSEE:    JOHN J. DZIUBAN, JR. D/B/A
TUFFY AUTO SERVICE CENTER**

**Lease Number: 764015**

**Signature:** _John Dzil_

**Date:** _10 - 22 - 99_

23155 NORTHWESTERN HWY. • SOUTHFIELD, MI 48075 • 248/827-2800 • 248/827-2801 FAX

**STATE OF ILLINOIS**

UNIFORM COMMERCIAL CODE -- FINANCING STATEMENT -- FORM UCC-1

INSTRUCTIONS

1. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee
2. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party.

c u t   h e r e

This STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| Debtor(s) (Last Name First) and address(es) | Secured Party(ies) and address(es) | For Filing Officer (Date, Time, Number, and Filing Office) |
|---|---|---|
| DZIUBAN, JOHN J., JR. d/b/a TUFFY AUTO SERVICE CENTER 2706 THEODORE STREET JOILET, IL 60431 | THE BANCORP GROUP, INC. 23155 NORTHWESTERN HIGHWAY SOUTHFIELD, MI 48075 | |
| 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 | 38-2429313 | |

1. This financing statement covers the following types (or items) of property:

THIS FINANCING STATEMENT IS BEING RECORDED PURSUANT TO A LEASE BETWEEN THE SECURED PARTY AND THE DEBTOR FOR NOTICE PURPOSES ONLY AND SHALL NOT BE DEEMED TO GRANT THE DEBTOR ANY OTHER PROPERTY INTEREST IN THE EQUIPMENT DESCRIBED HEREIN. INCLUDING PROCEEDS OF FIRE INSURANCE IF ANY.

EQUIPMENT: SEE SCHEDULE "A" ATTACHED HERETO AND MADE PART HEREOF.

LEASE NUMBER: 764015

ASSIGNEE OF SECURED PARTY

2. ☐ Products of Collateral are also covered.   ☐ Proceeds of Collateral are also covered.

_____ Additional sheets presented.

__X____ Filed with

_____ Debtor is a transmitting utility as defined in UCC §9-105.

MARY E. LORD, ATTORNEY-IN-FACT

By: _____
Signature of (Debtor)

(Secured Party)*

*Signature of Debtor Required in Most Cases:
Signature of Secured Party in Cases Covered by UCC §9-402 (2)

This form of financing statement is approved by the Secretary of State.

STANDARD FORM -- UNIFORM COMMERCIAL CODE -- FORM UCC-1 -- REV. 1 - 75

c u t   h e r e

## STATE OF ILLINOIS
### UNIFORM COMMERCIAL CODE -- FINANCING STATEMENT -- FORM UCC-1

**INSTRUCTIONS**

1. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee
2. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party.

--- cut here ---

This STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| Debtor(s) (Last Name First) and address(es) | Secured Party(ies) and address(es) | For Filing Officer (Date, Time, Number, and Filing Office) |
|---|---|---|
| DZIUBAN, JOHN J., JR. d/b/a TUFFY AUTO SERVICE CENTER 2706 THEODORE STREET JOILET, IL 60431 | THE BANCORP GROUP, INC. 23155 NORTHWESTERN HIGHWAY SOUTHFIELD, MI 48075 | |
| 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 | 38-2429313 | |

1. This financing statement covers the following types (or items) of property:

THIS FINANCING STATEMENT IS BEING RECORDED PURSUANT TO A LEASE BETWEEN THE SECURED PARTY AND THE DEBTOR FOR NOTICE PURPOSES ONLY AND SHALL NOT BE DEEMED TO GRANT THE DEBTOR ANY OTHER PROPERTY INTEREST IN THE EQUIPMENT DESCRIBED HEREIN. INCLUDING PROCEEDS OF FIRE INSURANCE IF ANY.

EQUIPMENT: SEE SCHEDULE "A" ATTACHED HERETO AND MADE PART HEREOF.

LEASE NUMBER: 764015

**ASSIGNEE OF SECURED PARTY**

2. ☐ Products of Collateral are also covered.  ☐ Proceeds of Collateral are also covered.

_____ Additional sheets presented.

__X__ Filed with

_____ Debtor is a transmitting utility as defined in UCC §9-105.

MARY E. LORD, ATTORNEY-IN-FACT

By _Mary E Lord_
Signature of (Debtor)

(Secured Party)*

*Signature of Debtor Required in Most Cases:
Signature of Secured Party in Cases Covered by UCC §9-402 (2)

This form of financing statement is approved by the Secretary of State.

STANDARD FORM -- UNIFORM COMMERCIAL CODE -- FORM UCC-1 -- REV. 1 - 75

--- cut here ---

## STATE OF ILLINOIS
UNIFORM COMMERCIAL CODE -- FINANCING STATEMENT -- FORM UCC-1

**INSTRUCTIONS**

1. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee
2. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party.

cut here

This STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code.

| Debtor(s) (Last Name First) and address(es) | Secured Party(ies) and address(es) | For Filing Officer (Date, Time, Number, and Filing Office) |
|---|---|---|
| DZIUBAN, JOHN J., JR. d/b/a TUFFY AUTO SERVICE CENTER 2706 THEODORE STREET JOILET, IL 60431  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 | THE BANCORP GROUP, INC. 23155 NORTHWESTERN HIGHWAY SOUTHFIELD, MI 48075  38-2429313 | |

**1. This financing statement covers the following types (or items) of property:**

THIS FINANCING STATEMENT IS BEING RECORDED PURSUANT TO A LEASE BETWEEN THE SECURED PARTY AND THE DEBTOR FOR NOTICE PURPOSES ONLY AND SHALL NOT BE DEEMED TO GRANT THE DEBTOR ANY OTHER PROPERTY INTEREST IN THE EQUIPMENT DESCRIBED HEREIN. INCLUDING PROCEEDS OF FIRE INSURANCE IF ANY.

EQUIPMENT: SEE SCHEDULE "A" ATTACHED HERETO AND MADE PART HEREOF.

LEASE NUMBER: 764015

ASSIGNEE OF SECURED PARTY

2. ☐ Products of Collateral are also covered.  ☐ Proceeds of Collateral are also covered.

_____ Additional sheets presented.

__X____ Filed with

_____ Debtor is a transmitting utility as defined in UCC §9-105.

MARY E. LORD, ATTORNEY-IN-FACT

By _____
Signature of (Debtor)

(Secured Party)*

*Signature of Debtor Required in Most Cases:
Signature of Secured Party in Cases Covered by UCC §9-402 (2)

This form of financing statement is approved by the Secretary of State.

STANDARD FORM -- UNIFORM COMMERCIAL CODE -- FORM UCC-1 -- REV. 1 - 76

cut here

**STATE OF ILLINOIS**
UNIFORM COMMERCIAL CODE -- FINANCING STATEMENT -- FORM UCC-1

**INSTRUCTIONS**
1. Remove Secured Party and Debtor copies and send other 3 copies with interleaved carbon paper to the filing officer. Enclose filing fee
2. If the space provided for any item(s) on the form is inadequate the item(s) should be continued on additional sheets, preferably 5" x 8" or 8" x 10". Only one copy of such additional sheets need be presented to the filing officer with a set of three copies of the financing statement. Long schedules of collateral, indentures, etc., may be on any size paper that is convenient for the secured party.

c u t   h e r e

| This STATEMENT is presented to a filing officer for filing pursuant to the Uniform Commercial Code. | | For Filing Officer (Date, Time, Number, and Filing Office) |
|---|---|---|

**Debtor(s) (Last Name First) and address(es)**
DZIUBAN, JOHN J., JR.
d/b/a TUFFY AUTO SERVICE
CENTER
2706 THEODORE STREET
JOILET, IL  60431

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

**Secured Party(ies) and address(es)**
THE BANCORP GROUP, INC.
23155 NORTHWESTERN HIGHWAY
SOUTHFIELD, MI  48075

38-2429313

1. This financing statement covers the following types (or items) of property:
THIS FINANCING STATEMENT IS BEING RECORDED PURSUANT TO
A LEASE BETWEEN THE SECURED PARTY AND THE DEBTOR FOR
NOTICE PURPOSES ONLY AND SHALL NOT BE DEEMED TO GRANT
THE DEBTOR ANY OTHER PROPERTY INTEREST IN THE
EQUIPMENT DESCRIBED HEREIN. INCLUDING PROCEEDS OF FIRE
INSURANCE IF ANY.

EQUIPMENT: SEE SCHEDULE "A" ATTACHED HERETO AND MADE
PART HEREOF.

LEASE NUMBER: 764015

**ASSIGNEE OF SECURED PARTY**

2. ☐ Products of Collateral are also covered.    ☐ Proceeds of Collateral are also covered.

**COPY**

_____ Additional sheets presented.

__X___ Filed with

_____ Debtor is a transmitting utility as defined in UCC §9-105.

MARY E. LORD, ATTORNEY-IN-FACT

By:_____
Signature of (Debtor)

(Secured Party)*

*Signature of Debtor Required in Most Cases:
Signature of Secured Party in Cases Covered by UCC §9-402 (2)

This form of financing statement is approved by the Secretary of State.

STANDARD FORM -- UNIFORM COMMERCIAL CODE -- FORM UCC-1 -- REV. 1 - 76

c u t   h e r e

## THE BANCORP GROUP, INC.

## FRANCHISEE FINANCING AGREEMENT

This Franchisee Financing Agreement ("Agreement"), dated as of June 22, 1999, is made and entered into by and between The Bancorp Group, Inc. (hereinafter referred to as "Bancorp") a Michigan corporation and Tuffy Associates Corp., a Delaware corporation (hereinafter referred to as "Tuffy").

### RECITALS

A.     Tuffy desires a source of financing for its existing and potential franchisees ("Franchisees") for use in connection with their Tuffy franchise business.

B.     The parties have entered into this Agreement to set forth the terms and conditions upon which Bancorp will provide a source of financing for Franchisees.

### AGREEMENT

### ARTICLE I
### CREDIT FACILITY

1.1     Credit Facility.  Bancorp shall provide a credit facility for Franchisees on the terms and subject to the conditions set forth in this Agreement.  The amount of the credit facility shall be up to, but not in excess of three million dollars ($3,000,000,00).  Bancorp shall not finance any transactions which would cause the total amount financed by Bancorp pursuant to this Agreement to exceed such amount.  Any advances made under such credit facility shall be in the sole and absolute discretion of Bancorp.  Without limiting the foregoing, Bancorp shall not finance any transaction following the occurrence of a default by Tuffy under this Agreement until such default is cured to the satisfaction of Bancorp.

### ARTICLE II
### CREDIT PROCEDURES, TERMS AND ADMINISTRATION

2.1     Financing Procedures.   The following procedures shall be employed in determining the availability of financing for Franchisees under this Agreement.

    (a)     In the event a Franchisee shall indicate an interest in obtaining financing for use in connection with its franchise business, Tuffy shall provide the Franchisee with a credit application and other credit documentation, to be developed by Bancorp and approved by both Bancorp and Tuffy.  Nothing shall prevent Tuffy from providing financing information from other parties to any Franchisee.

**PLAINTIFFS' EXHIBIT D**

(b)     After the Franchisee has completed the credit application and provided the other credit documents specified by Bancorp, if such credit application and other credit documents are acceptable to Tuffy, Tuffy shall promptly forward the executed credit application and other credit documents to Bancorp at its office in Southfield, Michigan.

(c)     If, following completion of its review of such credit application and other credit documents and its credit investigation, Bancorp determines that it will provide the financing requested, it shall so notify the Franchisee and Tuffy and, upon receipt of such additional closing documents as Bancorp reasonably determines to be necessary for the approval of the credit and all advance payments required by Bancorp, Bancorp shall advance the funds pursuant to Bancorp's ordinary and customary practices (for purposes of this Agreement, all of the resulting obligations of the Franchisee to Bancorp are collectively referred to as "Receivables" and individually as a "Receivable").

2.2     Credit Approval.  Nothing herein shall obligate Bancorp to accept or approve any application for financing submitted by or on behalf of any Franchisee.  Bancorp may reject any application for financing submitted by or on behalf of any Franchisee; provided, however, should Bancorp reject or disapprove any such application it shall inform Tuffy and the Franchisee of the reasons therefor.  Such rejection or disapproval, however, shall be in the sole and absolute discretion of Bancorp.

2.3     Financing Terms and Credit Standards.  The specific terms of any financing provided by Bancorp to Franchisees under this Agreement, and the credit standards for approval of such financing, shall be determined from time to time by Bancorp in its sole and absolute discretion.

2.4     Collection Procedures.  Bancorp shall use its ordinary and customary practices and procedures to collect outstanding Receivables, subject to the provisions of this Agreement.

2.5     Workouts.  Provided Bancorp shall not have previously given Tuffy notice of default with respect to a Receivable pursuant to Section 4.1, Bancorp may at any time, at its sole discretion, amend payment schedules, defer payments or otherwise modify the terms of any such Receivable, without in any way affecting the obligations of Tuffy under this Agreement including, without limitation, under Article IV.  Bancorp shall provide prompt notice to Tuffy of all such material actions, provided that the failure to do so shall not affect the obligations of Tuffy unless it is actually prejudiced thereby.

2.6     Reports, Notices.  Upon reasonable request from Tuffy, Bancorp shall provide to Tuffy reports regarding the Receivables in such form as may be agreed upon from time to time by Tuffy and Bancorp.

2.7     Indemnification of Bancorp.  Bancorp shall have no liability of any kind to Tuffy or any Franchisees arising out of its decision not to fund any Franchisee, and Tuffy shall indemnify and hold harmless Bancorp against all liabilities and expenses in such circumstances. Tuffy shall comply in all respects with all applicable federal, state and local laws and regulations and the terms of any applicable agreements with or representations to any Franchisee in connection with such financing applications and activities, and shall indemnify and hold harmless Bancorp against all liabilities and expenses arising out of Tuffy's failure to comply with such laws and regulations.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

3.1     Representations and Warranties of Bancorp.  Bancorp hereby represents and warrants to Tuffy that:

(a)     Bancorp is a corporation duly organized, validly existing and in good standing under and pursuant to the laws of the State of Michigan. Bancorp has duly qualified and is authorized to conduct business and is in good standing as a foreign corporation in all jurisdictions where such qualifications is necessary. Bancorp has all requisite corporate power and authority to enter into this Agreement and to consummate the transactions herein contemplated. Bancorp has taken all corporate action necessary to duly authorize the execution of the Agreement and the consummation of all transactions herein contemplated.

(b)     This Agreement has been duly executed and delivered by Bancorp and is a legal, valid and binding obligation of Bancorp, fully enforceable in accordance with its terms.

3.2     Representations and Warranties of Tuffy.  Tuffy hereby represents and warrants to Bancorp that:

(a)     Tuffy is a corporation duly organized, validly existing and in good standing under and pursuant to the laws of the State of Delaware. Tuffy has duly qualified and is authorized to conduct business and is in good standing as a foreign corporation in all jurisdictions where such qualification is necessary. Tuffy has all requisite corporate power and authority and all requisite governmental permits and licenses to conduct its business, to enter into this Agreement, and to consummate the transactions herein contemplated. Tuffy has taken all corporate action necessary to duly authorize the execution of the Agreement and the consummation of all transactions herein contemplated.

3

(b)   This Agreement has been duly executed and delivered by Tuffy and is a legal, valid and binding obligation of Tuffy, fully enforceable in accordance with its terms.

(c)   The credit applications and other credit documents provided to Bancorp by Tuffy pursuant to Section 2.1 in connection with each application by a Franchisee for financing pursuant to this Agreement will in each case be all the documents received or acquired by Tuffy in connection with such application; each such document will have been duly executed by the persons whose signatures purport to appear thereon; none of such documents or any other materials submitted therewith will contain any false or misleading statements or information, and at the time such documents are provided to Bancorp and, if the application for financing is approved by Bancorp, at the time the resulting Receivable is funded by Bancorp, Tuffy will have no knowledge of any fact or circumstance that would materially adversely affect the enforceability or collectibility of the Receivable or Bancorp's rights thereunder or in the collateral securing such Receivable.

(d)   Tuffy has not made any misstatement of material fact to Bancorp or provided Bancorp with any false or misleading information relevant to this Agreement or omitted to provide Bancorp with any information known to Tuffy which would be material to Bancorp's decision to enter into this Agreement.  Tuffy will not make any misstatement of material fact to Bancorp or provide Bancorp with any false or misleading information relevant to any credit application or other credit documents submitted pursuant to this Agreement or any Receivable or omit to provide Bancorp with any information known to Tuffy which would be material to Bancorp's decision regarding any such credit application or Receivable.

(e)   The representations and warranties made herein shall be supplemented from time to time by such representations and warranties set forth in any documentation evidencing the purchase of any Receivable.

## ARTICLE IV
## RECEIVABLE DEFAULTS

4.1   <u>Notices</u>.  In the event any payments due under any of the Receivables are delinquent by more than 90 days or any Franchisee shall be in default under any of its obligations evidencing any Receivables, Bancorp may declare a default under any of the Receivables, and thereupon, Bancorp shall give written notice thereof to Tuffy.

4.2     Tuffy's Remarketing Obligations.

      (a)     For a period of ninety (90) days following receipt of written notice of default given pursuant to Section 4.1, Tuffy shall at its sole expense either (i) sell the franchise business of the defaulted Franchisee or assist the Franchisee in selling the franchise business to a new franchisee which is acceptable to Tuffy and Bancorp who will assume or payoff all obligations of the original Franchisee to Bancorp under the defaulted Receivable, or (ii) sell or assist the Franchisee in selling all equipment, signs and other goods financed pursuant to the defaulted Receivable, in preference to other similar items available for sale by Tuffy to Franchisees, to a successor Franchisee which is acceptable to Bancorp who will assume or payoff all obligations of the original Franchisee to Bancorp under the defaulted Receivable. All proceeds of such sale shall be paid to Bancorp up to the amount of indebtedness and other obligations then owed to Bancorp.

      (b)     During the ninety (90) day period specified in Section 4.2(a), Tuffy shall not be required to make any payments to Bancorp with respect to the defaulted Receivable. Provided Tuffy is not in default of its obligations under this Agreement, during the ninety (90) day period specified in Section 4.2(a), Bancorp shall refrain from taking possession of the collateral securing the defaulted Receivable.

      (c)     If by the end of the ninety (90) day period specified in Section 4.2(a) the obligations under the defaulted Receivable have not been assumed or paid off by a successor franchisee acceptable to Bancorp, Tuffy shall continue its remarketing efforts for an additional period of one hundred eighty (180) days, and during such period Tuffy shall pay to Bancorp all amounts which come due under such Receivable in accordance with its terms. The amounts due under such Receivable at the end of the ninety (90) day period specified in Section 4.2(a) shall be moved to the end of the term of the Receivable and shall be due and payable in full at that time. If a successor Franchisee, which must be acceptable to Bancorp, subsequently assumes all outstanding obligations under the Receivable, Tuffy will be relieved of its obligations under this sub-paragraph (c) with respect to that Receivable, unless the successor Franchisee subsequently defaults in its obligations to Bancorp under the Receivable, in which event the Receivable shall again be subject in all aspects to this Article IV.

      (d)     In the event Tuffy is able to remarket the franchise business of a defaulted Franchisee or the equipment, signs and other goods

financed pursuant to a defaulted Franchisee but the amount of the obligation of the defaulted Franchisee which is assumed or paid by the successor Franchisee is less than Bancorp's net investment (as the term is defined in Section 4.4) in the defaulted Receivable, Tuffy shall promptly pay Bancorp the difference between Bancorp's net investment in the Receivable which is assumed by the successor Franchisee.

4.3     Assumption by Tuffy.

(a)     At any time during the ninety (90) day period specified in Section 4.2(a) or the one hundred eighty (180) day period specified in Section 4.2(c), Tuffy may pay to Bancorp all amounts which are then delinquent under a defaulted Receivable and assume all obligations of the Franchisee to Bancorp with respect to the Receivable. Upon such payment and assumption by Tuffy, the Receivable shall become the direct obligation of Tuffy and shall be restated in good standing.

(b)     If at any time Tuffy (i) takes over the operations of the business or facilities of a Franchisee which is obligated to Bancorp under a Receivable or (ii) removes the equipment, signs or other goods financed by Bancorp pursuant to a Receivable and allows such equipment, signs or other goods to be used in one or more other Tuffy locations, whether during the ninety (90) day period specified in Section 4.2(a), the one hundred eighty (180) day period specified in Section 4.2(c) or otherwise, Tuffy shall pay to Bancorp all accrued interest, if any, under such Receivable and assume all obligations of the Franchisee to Bancorp with respect to the Receivable; the amounts, if any, due under such Receivable at the time of Tuffy's assumption thereof (excluding accrued interest) shall be moved to the end of the term of the Receivable and shall be due and payable in full at that time. If Tuffy subsequently decides to discontinue all operations of the business or facilities taken over by Tuffy from a Franchisee, whether as a Tuffy-operated business or as a Franchisee-operated business, or Tuffy fails to use the equipment, signs and other goods financed pursuant to the defaulted Receivable in another location, Tuffy shall promptly pay to Bancorp the full amount of Bancorp's net investment in the Receivable. For purposes of this Section 4.3(b), Tuffy shall be deemed to have taken over a Franchisee's operations on the day on which employees of Tuffy or an affiliate of Tuffy assume actual responsibility for operation of the business or facilities, whether or not the franchise agreement with such Franchisee shall have been terminated.

(c)     If following assumption of a Receivable by Tuffy pursuant to this Section 4.3, a successor Franchisee, which must be acceptable to Tuffy and Bancorp, assumes all obligations to Bancorp with respect to the Receivable, Tuffy will be relieved of the obligations assumed with respect to the Receivable pursuant to this Section 4.3; provided however, should the successor Franchisee later default in its obligations to Bancorp under the Receivable, such Receivable shall again be subject in all respects to this Article IV.

(d)     Notwithstanding anything in this Section 4.3 to the contrary, Bancorp shall have the right to impose such restrictions and limitations, and to modify such restrictions and limitations from time to time, on Tuffy's assumption of Receivables pursuant to this Section 4.3 as Bancorp deems appropriate. All such restrictions and limitations shall be effective upon notice thereof to Tuffy, but shall not effect any assumptions completed prior to that time.

4.4     <u>Tuffy's Recourse Obligation</u>.

(a)     If Tuffy is unable to successfully remarket the franchise business of the defaulted Franchisee or the equipment, signs and other goods financed pursuant to the defaulted Receivable during the ninety (90) day period specified in Section 4.2(a) or the one hundred eighty (180) day period specified in Section 4.2(c), unless Tuffy has assumed the obligations of the Franchisee with respect to the defaulted Receivable as provided in Section 4.3, at the end of the one hundred eighty-day (180) period specified in Section 4.2(c), Tuffy shall promptly pay to Bancorp the amount of Bancorp's net investment in a Receivable (for purposes of this Agreement, Bancorp's net investment in a Receivable shall include Bancorp's unamortized costs associated with the Receivable as calculated by Bancorp. <u>See</u> Exhibit A). Tuffy's obligation under this section shall not be affected by any actions taken by Bancorp with respect to any Franchisee or Receivable. Tuffy hereby fully waives all defenses that may be asserted by it with respect to such actions and agrees that its obligations under this Agreement shall be absolute and shall not be subject to any rights of offset, counterclaims or other defenses.

(b)     Except as provided in this Section 4.4(b), Tuffy's aggregate liability for the payoff to Bancorp's net investment in Receivables under 4.4.(a) shall be limited to Three Million Dollars, ($3,000,000.00), plus the amount of Tuffy's net recovery with respect to all Receivables on account of which such payments are made. For purposes of this Section 4.4(b), Tuffy's net recovery with respect to a Receivable shall be the total gross amount

7

recovered by Tuffy with respect to such Receivable, whether from payments by the Franchisee, the guarantor(s) or any other person, from liquidation of collateral or otherwise, less Tuffy's actual out-of-pocket expenses directly related to such recovery. Upon request by Bancorp, Tuffy shall provide Bancorp with a detailed accounting of all such recovery. In no event shall payments made by Tuffy under Section 4.2(c) or 4.3 (with respect to Receivables assumed by Tuffy) be included for purposes of calculating the maximum recourse liability set forth in this Section 4.4(b). In the event Tuffy terminates the franchise of a Franchisee which is not then in default in its obligations to Bancorp under a Receivable or if a Receivable is assumed by a person or entity other than Tuffy or a Franchisee pursuant to Section 4.5, any payments subsequently made by Tuffy, or required to be made, pursuant to this Article IV with respect to such Receivable shall not be included for purposes of calculating the maximum recourse liability set forth in this Section 4.4(b).

4.5     <u>Assumption by Others</u>.   Sections 4.2 and 4.3 contemplate the assumption of Receivables by Franchisees or by Tuffy; Bancorp may from time to time, at its sole discretion, allow other persons or entities to assume Receivable pursuant to these Sections.

4.6     <u>Substitution of Receivables</u>.  In lieu of payment of the recourse amount specified in Section 4.4 with respect to a defaulted Receivable, with Bancorp's prior consent, Tuffy may substitute for such defaulted Receivable another franchisee promissory note, together with all guaranties, collateral and other rights related thereto. Such substituted franchisee promissory note and all the guaranties, collateral and other rights related thereto shall be considered a "Receivable" for all purposes under this Agreement. In the event the net present value (calculated using Bancorp's then existing rate for similar types of transactions) of all unpaid installments due under the terms of the new Receivable, as calculated by Bancorp, exceeds the net present value (calculated using the same discount rate) of the unpaid installments due under the terms of the defaulted Receivable, as calculated by Bancorp, Bancorp shall pay the amount of the difference to Tuffy, if such net present value of the new Receivable is less than such net present value of the defaulted Receivable, the Tuffy shall pay the amount of the difference to Bancorp.

## ARTICLE V
## MISCELLANEOUS

5.1     <u>Expenses</u>.  Except as expressly set forth herein, each party hereto shall pay and be responsible for its own expenses incurred in connection with the Agreement and the transactions herein contemplated. Provided further, if Tuffy defaults in its obligations to Bancorp hereunder, Tuffy shall pay all expenses (including reasonable attorney's fees and expenses) incurred by Bancorp in enforcing its rights hereunder.

5.2   Confidentiality: Proprietary Rights. During the term of this Agreement, Bancorp shall provide to Tuffy various forms, documents, procedures manuals and other information and materials for use in connection with the financing contemplated by this Agreement. Tuffy acknowledges and agrees that all such information and materials are proprietary to Bancorp and constitute private business information intended for Bancorp's exclusive benefit. Tuffy shall not use, and shall not permit its employees or agents to use, any such materials or information for any purpose other than as expressly contemplated by this Agreement. Tuffy shall maintain the confidentiality of all such materials and information with the same degree or diligence as it uses to protect its own proprietary information and trade secretes from disclosure to other parties.

5.3   Relationship of the Parties. The parties are independent contractors and are not engaged in a partnership or joint venture. Nothing herein shall confer on either party hereto the authority to act for or on behalf of the other party except as expressly provided herein.

5.4   Indemnification. Tuffy shall indemnify Bancorp and shall hold Bancorp harmless from any liability to or any claims or demands by any third parties arising out of the actions or conduct of Tuffy in connection with any breach of this Agreement. Bancorp shall indemnify Tuffy and shall hold Tuffy harmless from any liability to or any claims or demands by any third parties arising out of the actions or conduct of Bancorp in connection with any breach of this Agreement. The obligations to indemnify and hold harmless pursuant to this Section 5.4 shall survive the termination of this Agreement.

5.5   Compliance with Laws. Throughout the term of this Agreement, Tuffy and Bancorp shall each comply with all laws, regulations, rules and orders applicable to them.

5.6   Waiver. Any delay in exercising any power, privilege or right hereunder shall not operate as a waiver thereof, and no single or partial exercise of any power, privilege or right hereunder shall preclude any other or further exercise thereof, or the exercise of any other power, privilege or right. The waiver of any default hereunder shall not constitute a waiver of any subsequent defaults, but shall be restricted to the default so waived.

5.7   Notices. All notices or other communications hereunder shall be given in writing by either overnight courier service or pre-paid first class, registered or certified mail, to the respective addresses of the parties following their names on the signature pages of this Agreement. Such notice or other communication shall be deemed to have been given upon actual delivery or one (1) business day after depositing it with an overnight courier service or three (3) business days after depositing it with the United States Postal Service, provided that orderly delivery of the mail is not then disrupted.

5.8   Severability. If at any time any provision, or the application of any provision, of this Agreement shall be held by any court of competent jurisdiction to be illegal, void or unenforceable, such provision or the application thereof, shall have no effect upon and shall not impair the enforceability of any other provision of this Agreement.

9

5.9     Entire Agreement; Amendments.  This Agreement may not be changed, modified or terminated orally; it may only be modified with the written consent of both Bancorp and Tuffy.  This Agreement contains the entire agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements and understandings with respect thereto.

5.10    Survival.  All representations, warranties and covenants contained herein or in any document or instrument executed or delivered in connection with the execution of this Agreement shall survive execution of this Agreement.

5.11    Binding Effect.  This Agreement shall inure to the benefit of and the obligations created hereby shall be binding upon the parties and their permitted successors and assigns.

5.12    Assignment.  This Agreement may not be assigned by either Bancorp or Tuffy without the consent of the other party; provided, however, Bancorp may assign this Agreement to an affiliated entity that controls, is controlled by or is under common control with Bancorp. Notwithstanding any assignment pursuant to this Section, the assignor shall remain liable for all of its obligations under this Agreement and shall not be relieved of any such obligations by such assignment.

5.13    Audit.  Bancorp shall have the right to inspect the books and records of Tuffy relating to Franchisees who are obligated to Bancorp under Receivables, including the obligations of such Franchisees to Tuffy.  Bancorp shall keep the information obtained from such books and records confidential; nothing herein, however, shall limit Bancorp's rights to use such information in administering the Receivables or in enforcing its rights under the Receivables or under this Agreement.

5.14    Further Assurances.  Tuffy shall, upon request of Bancorp, execute and deliver such additional documents and instruments as may be reasonably required by Bancorp for carrying out the purposes of this Agreement.

5.15    Financial Statements; Banking Covenants.  Tuffy shall provide to Bancorp copies of its year-end financial statements and its Uniform Franchise Offering Circular no later than one hundred twenty (120) days following the end of each fiscal year during the term hereof and shall also provide to Bancorp copies of all its interim financial statements promptly upon request by Bancorp.  Tuffy shall also provide to Bancorp a copy of its current banking covenants and all subsequent modifications thereto for Bancorp's review.

5.16    Termination.  This Agreement shall be effective on and as of the date of its execution and shall continue in effect thereafter until terminated.  This Agreement may be terminated by either party hereto by giving the other party at least sixty (60) days prior written notice.  Notwithstanding the termination of this Agreement, all rights of Bancorp and all duties and obligations of Tuffy under this Agreement with respect to outstanding Receivables on the date of such termination shall continue until all such Receivables are fully paid in accordance with their terms.

5.17   Effective Date.   This agreement is made _June 22_____, 1999 and is effective for all purposes as of ___June 22_____, 1999.

5.18.   Supplemental Agreements.   In the event of any conflict between the terms of this Agreement and any other agreement between Tuffy and Bancorp governing any Receivable, the terms of such other agreement should govern and control.

5.19.   GOVERNING LAW.   THIS AGREEMENT WILL BE ACCEPTED AND MADE IN, AND WILL BE A CONTRACT UNDER THE LAWS OF THE STATE OF MICHIGAN AND SHALL FOR ALL PURPOSES BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF MICHIGAN (EXCLUDING THE LAWS APPLICABLE TO CONFLICTS OR CHOICE OF LAW).

[signatures on the following page]

11

**IN WITNESS WHEREOF**, the Seller and the Purchaser have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized.

THE BANCORP GROUP, INC.
23155 Northwestern Hwy.
Southfield, MI 48075

By: _____

Title: _____

TUFFY ASSOCIATES CORP.
1414 Baronial Plaza Drive
Toledo, OH 43615

By: _____

Title: _President & CEO_

12

## EXHIBIT A

### EXAMPLE OF NET INVESTMENT CALCULATION

| | |
|---|---|
| Remaining principal balance | $50,000.00 |
| Unamortized Costs (2.5%) | 1,250.00 |
| Net Investment | $51,250.00 |

Bancorp's Net Investment shall include, but not be limited to, marketing, credit, and collections costs, including attorneys' fees, as well as Bancorp's cost of billing, invoicing and servicing the loan for the term. These costs are included in the rate anticipating the Borrower will make all the payments. The cost are amortized over the term of the loan.

DETROIT 26021-1 423355 v4

13

UNITED STATES DISTRICT COURT,
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

**DOCKETED**

OCT 1 9 2001



# CIVIL COVER SHEET

I. Plaintiff: **Tuffy Associates Corp.**

Defendant: **John J. Dziuban, Jr.**

County of Residence:

County of Residence: **Will**

Plaintiff's Atty: **Terence J. Moran, Esq.**
**Gessler Hughes Socol Piers**
**Resnick & Dym, Ltd.**
**70 W. Madison, Suite 2200**
**Chicago, IL 60602**
**(312) 580-0100**

Defendant's Atty:

**JUDGE NORGLE**

**01C 8027**

II. Basis of Jurisdiction: **4. Diversity (complete item III)** MAGISTRATE JUDGE KEYS

III. Citizenship of Principal
Parties: (Diversity Cases Only)

Plaintiff: **1. Citizen of Another State (Delaware and Ohio)**
Defendants: **2. Citizen of Illinois**

IV. Origin: **1. Original Proceeding**

V. Nature of Suit: **190. Other Contract**

VI. Cause of Action: **Breach of Contract; Conversion; Subrogation (Breach of Contract)**

VII. Requested in Complaint: Class Action: **No**

Dollar Demand: **At least $192,588.95, plus interest, punitive**
**damages, costs, expenses and attorneys' fees**

Jury Demand: **No**

VIII: This case **IS NOT** a refiling of a previously dismissed case.

Signature:

Date: 10/18/01

FILED-ED4
01 OCT 18 PM 4:05
CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

In the Matter of: **TUFFY ASSOCIATES CORP. v. JOHN J. DZIUBAN, JR.**

Case Number:  01C 8027

JUDGE NORGLE

APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:
**TUFFY ASSOCIATES CORP.**

MAGISTRATE JUDGE KEYS

DOCKETED
OCT 1 9 2001

| (A) | | | | (B) | | | |
|---|---|---|---|---|---|---|---|
| SIGNATURE | | | | SIGNATURE | | | |
| NAME  Terence J. Moran | | | | NAME | | | |
| FIRM  Gessler Hughes Socol Piers Resnick & Dym, Ltd. | | | | FIRM | | | |
| STREET ADDRESS 70 W. Madison, Suite 2200 | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP  Chicago, Illinois 60602 | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER  (312) 580-0100 | | | | TELEPHONE NUMBER | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 06185861 | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| | | | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |
| (C) | | | | (D) | | | |
| SIGNATURE | | | | SIGNATURE | | | |
| NAME | | | | NAME | | | |
| FIRM | | | | FIRM | | | |
| STREET ADDRESS | | | | STREET ADDRESS | | | |
| CITY/STATE/ZIP | | | | CITY/STATE/ZIP | | | |
| TELEPHONE NUMBER | | | | TELEPHONE NUMBER | | | |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) | | | |
| MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | | MEMBER OF TRIAL BAR? | YES ☐ | NO ☐ | |
| TRIAL ATTORNEY? | YES ☐ | NO ☐ | | TRIAL ATTORNEY? | YES ☐ | NO ☐ | |
| DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | | DESIGNATED AS LOCAL COUNSEL? | YES ☐ | NO ☐ | |

CLERK U.S. DISTRICT COURT
01 OCT 18 PM 4: 06
FILED-E04